OPINION OF THE COURT
Patrick D. Monserrate, J.
This decision represents one of the first opportunities for a trial-level Judge — in the solitude characteristic of that calling —to apply the recent decision of the Court of Appeals permitting/requiring a form of "harmless error” analysis in a post-conviction CPL article "440 motion” based upon the deprivation of Rosario material at the long-ago trial of a convicted defendant (People v Jackson, 78 NY2d 638 [1991]).[1]
In and by a January 9th decision this court found that Rosario error (in the form of undisclosed impeachment material) had occurred in connection with defendant’s 1986 trial, and requested that respective counsel then address themselves to the Jackson issue, viz.: Whether the defendant can demonstrate, by a fair preponderance of the evidence, that he was prejudiced by the Rosario violation, in that there is a reasonable possibility that the failure to disclose the Rosario material contributed to the guilty verdict against him. Those submissions have now been received.
Before reaching the central issue at hand, defense counsel deserve to have two matters addressed which bring into question whether the Jackson decision (supra) should be applied at all to their client’s case and, if so, the manner of its application.
The Constitutionality of Jackson
Defense counsel initially claim to be entitled to the benefit *511 for their client of the law in New York as it was prior to December 19, 1991 for both "440 defendants” bringing collateral attacks against their convictions and those still within the process of direct appeal. The rule before was "per se reversible error” for the type of Rosario violation found to have occurred here, with no room for harmless error or prejudice analysis as might "save” the conviction (People v Ranghelle, 69 NY2d 56 [1986]; People v Novoa, 70 NY2d 490 [1987]). That rule still obtains for the defendant directly appealing his conviction; only the "440 movants” such as Jackson — and Bianco — must now go further and demonstrate a prejudicial nexus between the Rosario error committed in their cases and the jury convictions which followed. Counsel for Bianco cite the resulting distinction as being not only unreasonable and unfair, but unconstitutional.
They assert that the dichotomous treatment by the Court of Appeals of the two classes of convicted defendants, in requiring a more stringent test for vacating a conviction by collateral attack than by direct appeal, is a violation of the Federal constitutional prohibition against denial by a State to a citizen of "equal protection of the laws” (US Const, 14th Amend, § 1).
Whatever merit that argument may have, it must await a hearing by and decision from a higher court, not a lower one. This court’s oath-bound duty is to accept the rule of Jackson (supra) and to apply it as fairly as possible — as with any other provision of the law of this State, whether Judge-made or by the will of the Legislature. This is neither the time nor the forum for this court to entertain arguments for or against the rule’s wisdom, nor to countenance obstruction of its implementation.
The "Actual Prejudice” of Jackson
Perhaps taking their cue from language within the Jackson decision (supra), defense counsel then urge the court to resolve the issue of the "prejudicial effect” of the Rosario violation in the eyes of the Bianco jury (if it must) by hearing from (at least) one of their number. They offer a sworn statement from a juror (professing a willingness to testify to like effect) assuring the court that the Rosario violation of which she has now been made aware would have affected her decision, and (to her view) that of other jurors.
To be sure the Jackson majority appears to speak to that *512 actual reality of what happened in the particular courtroom— and in the particular jury room:
"To prevail under CPL 440.10 (1) (f), however, a defendant must do more than demonstrate that the conduct at issue was improper. The statute by its very terms affords a remedy only if the defendant’s trial was affected by conduct that was both improper and prejudicial. The statute compels an inquiry into the presence or absence of prejudice * * *
"To assume prejudice without requiring the defendant to demonstrate actual prejudice would eviscerate the language of CPL 440.10 (1) (f) and the concern for finality that underlies this language * * *
"[W]e believe that a defendant raising a Rosario claim by way of a CPL 440.10 motion must make a showing of prejudice. We will not step in and cut off that inquiry” (People v Jackson, supra, at 646-647 [emphasis added]).
What defense counsel urge, in sum, is that the court treat the rule of Jackson as requiring the application of a subjective test whereby to determine what the specific jurors would have done (according to them) in a specific case had they known of specific evidence of which (by definition) they did not know. The court cannot subscribe to such a theory, nor ascribe it to the majority of the Court of Appeals.
Despite the majority’s use of the phrase "actual prejudice” and its characterizing of CPL 440.10 (1) (f) as a law which "compels an inquiry into the presence or absence of prejudice” which they "will not step in and cut off” (78 NY2d, at 646, 647), this court cannot accept the proposition that what the Court of Appeals has envisioned is for "440” litigants (on both sides) to seek out and solicit testimony from surviving members of the actual jury panels involved, so that they may bear personal witness to what happened in the jury room and what might/should/could have happened if * * *. Several reasons come readily to mind for eschewing such an approach.
First of all, it would be illogical. By adopting a "reasonable possibility of prejudice” standard the Court of Appeals obviously took a step away from the per se reversible error "rule without reason” of Ranghelle (supra). However, it took only a step away. The court specifically refused to ascend further up the scale of chance to a standard of "reasonable probability” (United States v Bagley, 473 US 667 [1985]), or anything remotely near the Crimminsian heights of harmless error, i.e., "the significant probability * * * that the jury would have *513 acquitted the defendant had it not been for the error or errors which occurred” (People v Crimmins, 36 NY2d 230, 242 [1975]).
The majority of the Court of Appeals said as much in deciding Jackson (supra, at 649): "Any other standard [than that of 'reasonable possibility’] would create too great a disparity between the treatment of these claims on direct appeal, where a per se rule continues to apply, and on a postconviction motion, where, as we hold today, CPL 440.10 requires a finding that the defendant was prejudiced by the failure to turn over Rosario material”.
To now argue that this court should listen to real jurors talk about actual prejudice is to espouse the proposition that the Court of Appeals was not talking about earthbound rational analyses of possibility or probability at all, but was commissioning expeditions into the relative stratosphere of the real and actual. That simply makes no sense.
Furthermore, the nature of the evidence to be reasonably anticipated from such "inquiry” of the actual jurors, as the defense suggests, would, to the court’s view, be patently unseemly, often unavailable, and almost always unreliable.
For the court to probe the minds and memories of the Bianco jurors would be inconsistent with the tradition in this State for honoring the secrecy and sanctity of jury deliberations in criminal matters. New York courts have scrupulously avoided such official forays behind the closed doors of the jury room and the Court of Appeals has repeatedly reminded us that "The strong public policy favoring the absolute confidentiality of jury deliberations is not lightly to be disregarded” (People v Bouton, 50 NY2d 130, 138 [1980]).[2]
Also were such "first person” evidence to be required, preferred, or even permitted in "440” cases, many litigants on both sides would be prejudiced by the simple passage of time. It is the hallmark of such applications that their archivistic reach into the closed files of yesteryear may transcend the *514 lifespan or viable memory life of the participants. For example, the Jackson case (supra), itself, involved a 1981 trial for the setting of an earlier fire in which six firefighters died, while a companion case decided on the same day (and in the same way) (People v Bin Wahad, 79 NY2d 787) had to do with a 1973 trial for a 1971 police officer homicide.
Finally, the experience of recent years has provided some informative insight into the posttrial statements of criminal trial jurors who have voted to convict a fellow citizen. What we learn is that such opinion-poll reaction is notoriously unreliable, and to anoint it as "evidence” in subsequent proceedings would be grossly unfair, particularly to the People. The eye of memory easily focuses on the increasingly familiar scene of jurors being subjected to media interview as they leave the courthouse wherein they had unanimously convicted someone for something. But by the time of those interviews — minutes after their verdict has been rendered— some of those same jurors, eager to shed the unfamiliar mantle of public responsibility for the fate of another, are heard to utter: "I voted guilty, but” or "I don’t think they proved their case, but”. It is not difficult to imagine the answers of any of these, summoned back to court years later to be informed that certain evidence had been withheld from them and then to be asked: "Had you known about (this, that, or the other) would it have changed your verdict?” Of course. For the courts to employ such a methodology in CPL article 440 cases would not be embarking on a search for truth, but rather would be extending an invitation to disaster.
While Jackson (supra) remains part of our law, "440” litigants do not need to be saddled with the onerous-if-possible burden of finding (or discrediting) sympathetic second-thinking former jurors. Rather their need is for fair minded present day Judges who will make a detached and reasoned assessment of the case against the defendant as it went to the jury which convicted him/her in the light of the evidence of which both defendant and jury had been wrongfully deprived. Through that process the infectious organism of prejudice can be as readily discerned — and more fairly so.
The Jackson Standard for Rosario Review
The Court of Appeals has enjoined courts reviewing "440” motions based upon the deprivation of Rosario material to decide whether there was a "reasonable possibility” that such *515 failure to disclose "contributed to the verdict.” If so, there was "prejudice,” now requiring remedial relief; if not, there was none (People v Jackson, supra, at 649).
Such a standard — despite the expressed fears of the dissenters — does not seem to the court significantly difficult either to understand or to apply.
"Reasonable” is as familiar a concept as there is in the law. Each and every day Judges or juries render judgments about certain conduct having (or not having) a rational basis which (if need be) could be acceptably explained — though usually not to the exclusion of all other logically valid conclusions, even those to the contrary.
As already discussed, "possibility” in this context is to be contrasted with and differentiated from the more demanding "probability” — a difference in degree between that which common sense views as likely at all and that which is seen as more likely than not.
"Contributing” to a verdict connotes an element of materiality or importance. Not necessarily rising to sine qua non status, but a fact or factor which deliberating jurors may not only have considered (what evidence could elude that net?) but that they may reasonably have found to have had some significance in satisfying them, unanimously, that the People had sustained their substantial burden of proof. An undisclosed inconsistency in a witness’s prior statement as to the time of day when a defendant arrived or left a location might be disregarded (though still a Rosario violation) in a case where the accused admits the crime but raises some affirmative defense. However, that same Rosario violation might be seen as having "contributed” to a guilty verdict if the central issue in the trial were an alibi.
Additionally, though left unsaid by the Court of Appeals, it is implicit in the rule which it promulgated that a reviewing court should assess the cumulative effect of any/all Rosario violations on the verdict, rather than to view each error in isolation and if no single violation seems enough then to deny a defendant’s motion.
And, finally, in undertaking the required analysis it seems important to focus on the reasonable reaction to the absent evidence from the viewpoint of the hypothetical fair minded "deliberative” juror.
The latter phrase is consciously chosen to differentiate among the three classes of jurors who may normally walk into *516 a jury room to commence their deliberations, but for two of which the presence or absence of the subject evidence would have had no significance whatsoever. The "determined” jurors’ minds are made up before the deliberations begin (and probably far earlier than that), and they are not to be dissuaded by discussion or argument — or evidence. The defendant is guilty and that’s that. The "disciple” jurors enter the jury room comforted by their secret vow to follow the majority where it leads. They participate in the ensuing deliberations only as moral and intellectual hitchhikers who will "go with the flow” without contributing any independent thought to the process or to its end product. By contrast, of course, the "deliberative” jurors are of fair and open minds, have listened attentively throughout the trial, and embark upon the deliberations (with some trepidation) willing to discuss, to listen, and hopefully to come to the right decision — and probably to worry about it later. To such jurors, the evidence is important, as is their oath. Unfortunately, the "guilty” vote of each of the three types means the same to a convicted defendant.
To be measured in the analysis which follows, then, is the commonsense effect of the undisclosed Rosario evidence on (an) average deliberative juror(s) who had heard and seen that which Thomas Bianco’s jurors heard and saw before they voted to convict him.
Application of Jackson to Bianco
It is fundamental courtroom wisdom[3] that the most persuasive forms of incriminating evidence which can be presented to a criminal trial jury are the "He did it” of the identifying eyewitness and the "I did it” of the confessing defendant. Such evidence not only goes to the core issue normally in controversy,[4] but also helps the prosecution to clear the highest hurdle on the path to conviction: Any doubt which jurors may have that anyone other than "the right man” is on trial.
Nothing less important is involved here.
In calling John Bazarnik to testify at trial it is clear that the People sought to establish one vital fact: that during a *517 May 8, 1982 conversation with the defendant, the latter had admitted: "I think I killed Julie Monson”.
It is equally clear that the thrust of the cross-examination of Bazarnik was to cast doubt on whether the defendant had uttered the words which the witness put in his mouth. It was pointed out that he had not related the alleged admission to the authorities during interviews of May 11th and August 2nd.
What the defense could/would/should have been in a position to demonstrate for the jury was that Bazarnik had said nothing of the admission during seven police/prosecutor interviews between the date of its alleged occurrence and when he finally disclosed it in May of 1983 (after specifically denying that it had happened). But — as this court earlier determined— the fact or content of five of the interviews, in addition to the denial, were not disclosed by the prosecution.
Whether the jury would have viewed Bazarnik as a less credible witness had he been confronted more extensively is concededly speculative, but one thing is certain: a more thorough cross-examination of the witness along the lines indicated could not by any reasonable measure have improved his standing in the eyes of the jury as an effective prosecution witness.
William Komanecky (a lieutenant at the Auburn Correctional Facility) and his son Andrew were also called as prosecution witnesses for a specific — and critical — purpose: to describe a man.
That man had been seen by them during the early morning hours of the night of Julie Monson’s disappearance. They had seen him standing near two stopped cars in the street below their second floor apartment on Prospect Street in Auburn talking with a female who would eventually get into his car with him and drive off, leaving her car — Julie Monson’s car— behind. By the time of the trial it was clear to everyone that, according to the prosecution theory, the female whom they had seen was Julie Monson and the male was her killer.
They described for the trial jury the man’s height: "somewhere between five ten and six feet” with "wide shoulders” "dark shoulder-length hair” and, according to the elder Komanecky, he had "high cheekbones”. That description arguably fit the defendant, Thomas Bianco.
The word "arguably” is used purposefully because in his closing argument to the jury the District Attorney attempted *518 to tie the Komanecky description to the defendant’s in-court appearance with the care and finality of a noose:
"Ladies and gentlemen, I submit to you that the description of those three witnesses[5] gave of the person that they saw out there on Prospect Street is entirely consistent with this defendant * * *
"So what do you know at this point? You know that you have somebody out there with long, dark, shoulder-length brown hair. You have somebody out there with a good build, small waist, broad shoulders. You know you have somebody out there that’s five feet, ten inches or maybe a little taller. Is all that consistent with this defendant, ladies and gentlemen? Sure it is. Think about it.
"There is one other physical characteristic, and I just throw it out for whatever you think its worth. Bill Komanecky testified when he looked out, one thing kind of stuck out. He appeared to have high cheekbones. Look at the defendant, ladies and gentlemen; look at him. He can cut his hair, he can lose weight, ladies and gentlemen, but he can’t change the appearance of his face, can he?”
At this perorative crescendo one can envision the eyes of the jurors settling on the defendant and their heads nodding imperceptibly. Most trials have their "defining moments;” for some Bianco jurors that could well have been one.
However, as this court has previously determined, there was information which those same jurors did not have, because it had not been provided to the defendant’s counsel.
On October 16, 1981, within days of the September 27th event, William Komanecky (the only trial witness to have given any facial description whatsoever of "the man”) had spoken with Joan Durham — in the presence of note-taking police detectives — and for the better part of an hour described the man, the girl, and the scene. To Durham, Komanecky had described the man as a "big” man — 200 pounds or more, broad shouldered, "about a size 44 jacket,” six feet tall or more with dark, shoulder-length hair who appeared to be in his "mid to *519 late 20’s.”[6] What about a description of facial features?, Ms. Durham was asked at the November 1991 hearing. There had been none; not "high cheekbones” or anything else — and for good reason. Komanecky had told Durham that the man had his back to him and that he had never seen his face.
The attorneys for the defendant were not told of the Durham interview of William Komanecky nor provided with the police notes taken contemporaneously therewith. This obviously deprived him of the trial opportunity to confront the witness Komanecky with his apparent failure to have even mentioned to Durham and the police the "one thing” that "kind of stuck out” both in his testimony and in the prosecutor’s summation. And there is one other scenario that is a "reasonable possibility”: had the defense known of Komanecky’s earlier description, perhaps the defendant’s "high cheekbones” would not have been a part of either William Komanecky’s testimony or the District Attorney’s summation.
So. Who is there to review the significant trial testimony given by John Bazarnik and the Komaneckys, to reflect upon the diminution in the probative value of that evidence in the mind of a well-motivated juror had s/he been aware of the unused impeachment material of which the defense was wrongly deprived, and then to reach the conclusion that there is no reasonable possibility that the failure of the People to disclose that Rosario material contributed to the guilty verdict rendered by the Bianco jury? Not I.
To the court’s view the appropriate epitaph to mark this phase of the case of People v Bianco was crafted by defense counsel in their most recent submission: "[T]here can be little doubt that the accused was severely prejudiced by the failure [of the People] to disclose the Rosario material in connection with these witnesses and that it not only contributed to but actually insured the verdict reached by the jury.”
Conclusion
By reason of the foregoing, the motion brought on behalf of *520 the defendant under date of March 28, 1991 to vacate the judgment of conviction entered against him in this court on May 6, 1986 will be granted, that judgment of conviction will be vacated, and a new trial will be ordered (CPL 440.10 [4]).

. A prospect made no less daunting by the earlier intimation from that same court that such analysis may not be practicable: "[W]hen, as a result of the prosecutor’s violation of the Rosario rule, defense counsel has been deprived of material of which he or she is unaware or cannot otherwise obtain, there is no way, short of speculation, of determining how it might have been used or how its denial to counsel might have damaged defendant’s case” (People v Jones, 70 NY2d 547, 552 [1987]). Or, indeed, by the protestations of the "Jackson three” (of the dissent) that the "Jackson four” —"a bare four-Judge majority” (People v Jackson, supra, at 652) — have made "relief for Rosario violations virtually unavailable in postconviction proceedings” (supra, at 651). And, of course, by the wave of instant analyses from the self-styled experts whose sweeping overview of gloom and doom would have no "440” defendant capable of sustaining the Jackson burden and would see the Republic itself at risk (cf., Kunstler, Goodbye to Rosario, NYLJ, Jan. 10,1992, at 2, cols 3, 4).

. Even on those relatively rare occasions when it has become necessary for courts to conduct posttrial inquiries as to whether "outside influences” had tainted the deliberative process in specific instances — the proscribed newspaper article, improper experimentation, unauthorized visitor, or the like — the search ceases when the offense is established. There is no call for continuing the process to determine the cause and effect dynamics between infraction and verdict (People v Ciaccio, 47 NY2d 431 [1979]; People v Legister, 75 NY2d 832 [1990]; People v Andrew, 156 AD2d 978 [4th Dept 1989]).

. If that term can be used in conjunction with a process so infuriatingly —and magnificently — unpredictable as a criminal jury trial.

. Obvious exceptions involve cases where the participation of the accused in the conduct charged is conceded and the issues are litigated as to his/her criminal culpability.

. The third witness was one Frank Busce, a visitor to the Komanecky apartment at the time. According to his testimony he spent less time looking out the window than the other two; he could add little to their description of the man and nothing about his facial appearance because he had not been able to see the man’s face from his (their?) vantage point in the Komanecky apartment.

. Thomas Bianco was 19 at the time.