OPINION OF THE COURT
Joseph Slavin, J.
On December 1, 1980 a jury convicted defendant of arson in the second degree and six counts of felony murder stemming from the arson. Defendant was sentenced on March 2, 1981. This conviction was affirmed.
In 1988, the defendant moved to vacate his conviction on the grounds that exculpatory material was withheld from the defense and ineffective assistance of counsel. Prior to the commencement of the hearing herein, the court informed the parties that consideration would be given to any possible Rosario violation (People v Rosario, 9 NY2d 286). During the course of the initial hearings I determined that there was a Rosario violation and vacated the judgment. While my initial order was affirmed, the Court of Appeals remanded the matter for further proceedings. Additional hearings were conducted.
In determining this motion, this court had considered the motion papers, the various reports, numerous affirmations and replies, memoranda of law by all parties, the testimony at the hearing, the exhibits and the trial testimony.
TRIAL
At trial it was established that between 8:20 and 8:30 a.m. on August 2, 1978, a fire was observed in the men’s room of Waldbaums supermarket, above the grocery area. Numerous witnesses testified that they did not observe any fire beneath the stairway.
As a result of the fire, six firemen were killed.
The evidence linking defendant to the fire was his alleged "confession” to Julio Cruz, Detective Harold J. Harmon and *720 former Assistant District Attorney Michael Gary. The “confession” stated that defendant and two others climbed up to the roof of the Waldbaums supermarket (it is, however, unknown what was used to enable them to climb to the roof).
Once on the roof, defendant and his companions made holes in the roof and threw paper doused with lighter fluid through the holes. It is not clear whether the paper was lit when thrown through the holes or whether the papers were thrown through the holes unlit and an object to ignite the paper was then thrown. After the fire was going well, defendant and his companions left for Coney Island. The confession alleged that the throwing of the paper with lighter fluid occurred late evening or early morning. The evidence established that this would have been around 5:30 through 6:00 a.m. in August of 1978. Defendant also stated that he had received $1,500 or $500 in order to set fire to the Waldbaums.
Defense strategy was to show through the People’s witnesses that the confession was inaccurate as to time of the fire and the place where the fire had occurred. Defense also attempted to show that the confession did not refer to a fire at the Waldbaums but to a fire approximately a year earlier at a Royal Farms store. Defense strategy was to rely solely on the witnesses produced by the People.
Besides the confession the People were required to prove that the fire was “arson”.
Former Fire Marshal Charles King testified that based upon his investigation he had found four separate points of origin of the fires. Three points of origin were underneath the stairway and one point of origin was in the men’s room. The three fires underneath the stairway were clearly deliberately set. Fire Marshal King concluded that where there exists different points of origin of the fires, this would prove that all fires were deliberately set.
According to Fire Marshal King, the men’s room fire was found almost immediately after the fire was put out.[1]
Nonetheless, it was Fire Marshal King’s opinion that the fire in the men’s room could not have come from the roof as defendant’s alleged admission stated. It was the Fire Mar *721 shal’s opinion that it was impossible for this to have been a "drop fire”. The burn marks, according to Fire Marshal King, indicated that the fire burned upwards, and had there been a "drop fire”, the marks would have indicated a downward burn.
Detective Harold Dugan testified that the fire commenced in the cock-loft above the men’s room. It was Detective Dugan’s expert opinion, that there had been a "reverse chimney effect”.
Dugan believed that due to air currents in the building the fire had started above the men’s room, fell on a beam therein and started to burn downward, but after reaching a certain point on the beam, began to burn upwards. Detective Dugan did not express, nor was he asked to express an opinion, as to whether the fire was accidental or deliberate.
During summation, the People argued there was no testimony that the fire was accidental. The prosecutor urged the jury to adopt Detective Dugan’s theory of a "reverse chimney effect”. He argued that the witnesses that had seen the fire all testified of seeing it burn five feet above the men’s room floor and not as Fire Marshal King opined, at the base of the beam.
Further, the Assistant District Attorney argued that there was evidence supporting Dugan’s "reverse chimney effect” from exhibit 20 and Lieutenant Nielson’s description of the fire as he encountered it. It was argued that Lieutenant Nielson had stated that the fire was moving laterally, which was consistent with Dugan’s air current theory.
Defense counsel urged the jury to believe Fire Marshal King’s opinion that the fire could not have dropped from the roof and was started at the base of the beam in the men’s room. Defense argued that Fire Marshal King had worked at the scene of the fire for two to three weeks sifting through the evidence. He urged that Detective Dugan only viewed photographs and was a "windbag” or a "con man”. He urged the jury not to credit Dugan’s testimony.
It is interesting to note that the court was never asked, nor did it charge the jury as to the corroboration requirements of a confession.
The jury convicted the defendant of all the charges. Defendant appealed his conviction and the Appellate Division affirmed without an opinion (People v Jackson, 103 AD2d 1047). The Court of Appeals also affirmed on the basis that the People have proven their case beyond a reasonable doubt, *722 even though the expert testimony was contradictory (65 NY2d 265).
HEARING
The hearing on defendant’s motion commenced in 1988. In the middle of the hearing there was discovered a document considered Rosario material, which had not been disclosed to the defense. The court ruled a per se violation of law required vacatur of the conviction without a showing of prejudice (People v Jackson, 142 Misc 2d 853). The Appellate Division affirmed this court’s decision (162 AD2d 470). The Court Appeals, in a four to three decision, reversed and held that a per se Rosario rule did not apply to postconviction postfinal appeal motions (78 NY2d 638). The case was remanded to this court for continuation of the hearing.
The court finds the testimony of former Detective Dugan totally credible, and the testimony of a former Assistant District Attorney who conducted the first stages of the investigation and a present Assistant District Attorney, evasive and disingenuous. All other witnesses were candid and honest. Based upon the credible evidence the court makes the following findings of fact:
1. Throughout this investigation, Detective Dugan was of the expert opinion that the fire had been caused by an electrical short in the cock-loft.
In order to establish a basis for his opinion, Detective Dugan conducted various experiments which had been videotaped, as well as requesting documentation regarding the electrical makeup of the store and the construction site. Defense counsel was never informed of Dugan’s opinion that the fire was not arson but electrical.
2. Detective Dugan was of the opinion that the three fires underneath the stairway were set after the fire had been extinguished. It was Dugan’s opinion that the fire beneath the stairway had been set by the Fire Department in order to benefit the families of the deceased fire personnel. While defense counsel knew that the Police Department believed that the Fire Department had planted certain evidence of arson, he did not know that it was Detective Dugan who had made such an accusation. Indeed, a memorandum prepared by Assistant District Attorney Weinger merely states that the Police Department accused the Fire Department of setting the fire. In People v Young (79 NY2d 365), the Court held that *723 although defendant knew the information he did not know the information was from the witness. This was a Rosario violation (supra, at 369-370).
3. Detective Dugan told various prosecutors of his opinion that the fire was not arson but accidental and that he believed that the Fire Department had set the fires underneath the stairway. This court makes this finding based upon the credible testimony of Detective Dugan as well as the following:
(a) A former Assistant District Attorney, when first asked whether Detective Dugan had ever told him that the fires had been accidental responded, "he told me that some fires were accidental, that he could say.”
While the former Assistant District Attorney later sought to retract this testimony, the court credits his initial testimony, made without prompting. Further, Detective Dugan testified that when he spoke to the former Assistant District Attorney he took copious notes.
(b) The former Assistant District Attorney testified that while he may have taken notes, it was his policy to destroy notes whenever he talked either to police officers or fire investigators. The testimony regarding the destruction of the notes as to his conversation with the witnesses, was a clear violation of the Rosario rule. At the time of this incident the Rosario case had been decided as well as People v Consolazio (40 NY2d 446). The court makes an adverse inference from the fact that the former Assistant District Attorney destroyed his notes (People v Wallace, 76 NY2d 953).
(c) Similarly, the lack of any Rosario material regarding the conversations between Detective Dugan and the various prosecutors who interviewed him, leads the court to make an adverse inference against the People. The inference the court makes is that had these notes been in existence they would not have supported the People’s position that Detective Dugan did not tell the prosecutor’s office of his opinions. The court finds that Detective Dugan told the prosecutor’s office that he believed that this was an electrical fire and not a deliberately set fire.[2]
(d) A former Assistant District Attorney testified that Du *724 gan was of the "assumption” that the three downstairs fires had been set by the Fire Marshals, but stated that was not Dugan’s opinion. The court believes that the former Assistant District Attorney’s choice of the word "assumption” rather than "opinion” is disingenuous.
4. The prosecutor did not disclose to defense counsel a memorandum written on March 26, 1979 by former Assistant District Attorney Gary to Assistant District Attorney Aiello. (This was the memorandum upon which the initial order for a new trial was based.) This memorandum contains the following information unknown to defense counsel: "King stated orally that the first three [fires] were found the first day of investigation. The fourth fire, the one that began in the men’s room, which caused the major damage which led to the firemen’s death, was uncovered two to three weeks later. There were no daily activity logs kept by King’s unit.”
This information indicates that Fire Marshal King’s testimony as to when the critical fire was discovered was inaccurate and could support Dugan’s theory that the Fire Marshals were responsible for the setting of the three fires below and possibly have planted the critical men’s room beam. The memorandum further states: "Regretfully, it must also be made clear that by the time this office sought to speak to the witnesses and to take their sworn statements, no one would speak to us without legal counsel being present. Later on, as our investigation progressed, some witnesses asked me privately, if they could sue the Fire Marshals concerning alleged mistreatment, and parents of some of the teenage cashiers, who worked at Waldbaums and had previously been interviewed by Fire Marshals refused to speak to me without subpoena.”
This also could well have been used to support a theory that the Fire Department was fabricating evidence of arson.
5. The District Attorney also did not disclose a memorandum dated February 25, 1980 from Assistant District Attorney Weinger to Assistant District Attorney Aiello and the information was unknown to the defense. This memorandum states: "With regard to the statement to Julio Cruz, initially Cruz states that he wasn’t sure that the fire he and Jackson were discussing was the Waldbaums fire. He too, initially refers to a Royal Farms fire. He also states Jackson viewed the fire they were talking about from a friend’s window. It is *725 unlikely Jackson knew anyone in the Sheepshead Bay area. It is more likely that he would be referring to watching a fire in Coney Island. Cruz’ demeanor in his initial conversation with ADA Frawley casts some doubt on his credibility as well.”
This information could have been investigated and possibly used to impeach the testimony of Julio Cruz as to the content of defendant’s alleged confession.
6. The prosecutor did not disclose a memorandum dated August 14, 1990 from Assistant District Attorney Besunder to Assistant District Attorney Lasky and the information was unknown to the defense. The memorandum contains the following: "A construction worker on the roof prior to the discovery of the fire saw no flames and saw no smoke and saw no holes in the roof. (Contra to Jackson’s statement.)”
This information is significant in that if prior to the discovery of the fire there was a construction worker on the roof who saw no holes in the roof, the testimony of said construction worker would seriously damage the credibility of defendant’s confession.
That memorandum also contains the following: "All of the experts stated that the fire could not have laid dormant from the time set until the time it was discovered and that smoke and/or flame would have been discovered or observed through holes. (Contra to Jackson’s statement.)”
Defense counsel argued at trial that the gap between the witnesses seeing the fire and the time specified in the defendant’s confession indicates that he did not set the fire and makes the confession unworthy of belief. However, no testimony was elicited from any person that a fire could not have lingered during that time period. If this information had been supplied, the lawyer would have been able to establish through expert testimony, rather than speculation, that the fire could not have laid dormant from the time Jackson in his confession alleged to have started the fire to the time that the fire was actually discovered.
7. Defense counsel knew that the ATF report stated that there was no accelerant found in the wooden temporary support in the men’s room where the major fire originated. While defense counsel knew this, he had no way of connecting it to an intelligent trial strategy. However, this information, when added to Detective Dugan’s opinion that the fire was *726 electrical, would probably have changed defense counsel’s strategy.[3]
8. The Fire Department was an integral part of the governmental investigation of the incident. Former Assistant District Attorney Gary’s trial testimony (questions and answers) indicates the following:
"Question: Did the agencies come and report to you and you instructed them what to do?
"Answer: Yes.
"Question: So you were giving instructions to the Fire Department, the Police Department and various members of your own office, is that correct?
"Answer: Yes.
"Question: You were giving all the instructions on this investigation?
"Answer: Yes.”
In former Assistant District Attorney Gary’s memorandum dated March 26, 1979, he stated as follows: "It was not until September 6, 1978, that this office was brought into the investigation to coordinate and supervise a joint investigation in conjunction with the Fire Marshals and the Police Department.”
The memorandum further went on and stated as follows: "In this office’s investigation into the fire, I worked in conjunction with Det. John McGrath, Shield 1635, 10th Homicide Zone, representing the Police Dept, and Fire Marshals Peter Capece, shield 203, and Vincent Asciolla, Shield 149, representing the Department of Fire Investigation. It was some weeks before the Fire Marshals could turn over to us most of the materials they had collected in their investigation. When this was largely accomplished, we began taking sworn statements from the witnesses who were Waldbaums’ employees working on the day of the fire.”
It is clear from all this that the Fire Department and its investigators were intertwined with the prosecutor’s investigation.
Further, the court takes judicial notice of CPL 1.20 (34) (i), which makes chief and deputy fire marshals, police officers as *727 a matter of law. The court further takes judicial notice of CPL 2.10 (28), making all members of the uniformed forces of the New York City Fire Department, peace officers. It is the duty of the Fire Department on behalf of the government, to investigate fires. The court finds that the government and in particular the prosecutor in this case, must be held accountable for the actions of the Fire Department since they were the prosecutor’s and the government’s agents (see, e.g., Michigan v Tyler, 436 US 499).
9. Neither the prosecutor nor defense was aware of a memorandum by Fire Inspector Paul Kotch to Stanley Lupkin dated September 19,1978. That memorandum indicates that it was the opinion of the Inspector General that fire personnel at the scene of the fire had departed from fire regulations, and had failed to ascertain the nature of the material of which the roof was made. Further, the Inspector General found that the number of fire persons on the roof was excessive and that they should have been withdrawn after the fire had been completely vented. The conclusion of the memorandum was that all these factors contributed to the collapse of the roof and ultimately, the death of these fine men who daily risked their lives for the well-being of all the people of this City.
This information adds a possible motive for the Fire Department’s opinion that the fire was “arson”. In conjunction with Dugan’s theory that the Fire Department started the three fires, this information was exculpatory. The Inspector General’s opinion could have provided a motive for Fire Marshal King’s opinion that the fire was deliberate in nature, and explained the sudden appearance of the beam two to three weeks after the fire had been extinguished.
10. Defense counsel knew that potential witnesses could have testified that they saw the fire burning on the bottom of the beam. This would have supported defense theory that the fire started inside the Waldbaums and not on the roof. While the reason for defense counsel not calling these witnesses is unknown, it is the court’s belief, from the totality of the circumstances, that other legal problems exist. I comment below.
11. Defense counsel knew that Cruz had initially stated that he had overheard Jackson make an admission, rather than the statement being made directly to him. Here also, the reason that defense counsel did not use his information to impeach the credibility of Cruz is unknown. Defense counsel *728 did, in fact, impeach Cruz’ testimony by a number of vicious and immoral acts.
12. Defense counsel was also aware of the May report. In that report, there is an indication that certain parts of the fire may have been electrical. This known information, in conjunction with Detective Dugan’s opinion as to the electrical nature of the fire, could have been extremely useful to defense counsel and surely would have been explored at trial.

BRADY

In Brady v Maryland (373 US 83, 87-88), the Court said:
"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
"The principle of Mooney v Holohan is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.’ A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile,’ to use the words of the Court of Appeals. 226 Md., at 427.”
Brady is based on a sense of fairness, and a belief that society gains when defendant is accorded a fair trial. (People v Simmons, 36 NY2d 126; see also, People v Vilardi, 76 NY2d 67, 76.) The focus is not on the misconduct of the prosecutor, but on the fairness of the procedure (United States v Agurs, 427 US 97, 110).
Because fairness of the trial is the major focus of Brady, information possessed by investigative agencies of the government and unknown to the prosecutor, will still result in a violation of defendant’s due process rights. (People v Trolia, 69 Ill App 3d 439, 388 NE2d 35 [1st Dist 1979], cert denied *729 Illinois v Trolia, 444 US 911; People v Galloway, 59 Ill 2d 158, 319 NE2d 498 [1974]; State of N. Dakota v Hilling, 219 NW2d 164, 168-169 [Sup Ct, ND 1974]; Commonwealth v Light, 394 Mass 112, 474 NE2d 1074, 1076 [1985]; United States v Perdomo, 929 F2d 967, 970-971 [3d Cir 1991].)
Society loses whenever a fair trial is impeded by the withholding of information by a governmental investigatory agency. (Barbee v Warden, 331 F2d 842, 846.) Two theories have been espoused why a vacatur of a conviction is necessary where the prosecutor does not know of the information but a governmental investigatory agency does possess the information.
The first theory is that all governmental investigatory agencies are arms of the prosecutor. Therefore, one arm of the prosecution team is in possession of and responsible for all the other functioning parts of the team. (Demers v State of Connecticut, 209 Conn 143, 547 A2d 28, 33-34; Freeman v State of Georgia, 599 F2d 65, 69-70 [5th Cir 1979], cert denied Georgia v Freeman, 444 US 1013; United States ex rel. Smith v Fairman, 769 F2d 386, 391-392 [7th Cir 1985]; Walker v Lockhart, 763 F2d 942, 958 [8th Cir 1985], cert denied Lockhart v Walker, 478 US 1020; United States v Butler, 567 F2d 885, 891 [9th Cir 1978], as amended Mar. 15, 1978, reh, reh en banc denied Apr. 7, 1978; State of Florida v Alfonso, 478 So 2d 1119 [Fla App, 4th Dist 1985], reh, reh en banc, certification of conflict denied Dec. 26, 1985, review denied 491 So 2d 280; State of Utah v Shabata, 678 P2d 785, 788 [Sup Ct, Utah 1984]; People v Fappiano, 134 Misc 2d 693, 695 [Sup Ct, Kings County 1987], affd 139 AD2d 524, lv denied 72 NY2d 918; People v Matera, 52 Misc 2d 674, 687 [Sup Ct, Queens County 1967] [Farrell, J.].)
The second theory is that the "government” has the Brady duty and not only the prosecutor. There is an independent duty on the part of each investigatory agency to disclose exculpatory material irrespective of the prosecutor’s knowledge. (United States v Bryant, 439 F2d 642, 650 [DC Cir 1971]; Barbee v Warden, 331 F2d 842, 846 [4th Cir 1964], supra; State of Montana v Patterson, 203 Mont 509, 662 P2d 291, 293 [1983]; Hale v State of Indiana, 248 Ind 630, 230 NE2d 432, 435 [1967]; State of Utah v Shabata, 678 P2d 785, 788 [Sup Ct, Utah 1984, supra]; State of New Mexico v Wisniewski, 103 NM 430, 708 P2d 1031, 1036 [1985], reh denied Sept. 18, 1985; State of Kansas v Johnson, 223 Kan 119, 573 P2d 976, 980 [1977]; People v Russo, 109 AD2d 855, 856 [2d Dept 1985]; *730 People v Stanard, 42 NY2d 74, 85; People v Fappiano, 134 Misc 2d 693, 695 [Sup Ct, Kings County], affd 139 AD2d 524, lv denied 72 NY2d 918, supra; People v Richter, 102 Misc 2d 285, 290 [Nassau Dist Ct 1979 [Fertig, J.].)
New York seems to adopt the approach that governmental investigatory agencies have an independent Brady duty of disclosure. In People v Russo (109 AD2d 855, 856, supra) the Court said: "the police have a duty to disclose exculpatory material in their control, failure to so disclose will constitute reversible error if such evidence is material to the defense and likely to have changed the jury’s verdict (see, People v McMullen, 92 AD2d 1059, 1060).”
In this case Detective Dugan and the Fire Department had an independent Brady duty to disclose exculpatory material that they possessed, regardless of the prosecutor’s knowledge. (See, cases cited above.) The form that the exculpatory material takes is irrelevant. Whether something is oral or written, if it tends to disprove defendant’s guilt or proves defendant’s innocence, justice is served if it is disclosed to defendant, and society gains by having a fair trial.
Defendant’s due process right does not depend upon whether the government decides to place exonerating information on a paper or keeps it in the mind of an investigatory agent. Nothing is gained nor is society’s interest in a fair trial fostered by the failure of investigatory agencies to write down exculpatory information. (Freeman v State of Georgia, 599 F2d 65 [5th Cir 1979] [concealment of witness], cert denied Georgia v Freeman, 444 US 1013, supra; United States v Butler, 567 F2d 885, 891 [9th Cir 1978], as amended Mar. 15, 1978, supra; reh, reh en banc denied Apr. 7, 1978, supra; State of Montana v Patterson, 203 Mont 509, 662 P2d 291, 292-293 [1983], supra; State of Utah v Shabata, 678 P2d 785, 787-789 [Sup Ct, Utah 1984], supra.)
Exculpatory evidence is not limited to evidence which supports the defense theory at trial. Evidence which would lead to different trial strategy is also within the Brady rule (United States v Bagley, 473 US 667, 682-683). If defendant would have had a better or more successful trial strategy, had the unknown information been known, then justice would not have been done at the trial and defendant’s fair trial rights would be violated. (Freeman v State of Georgia, 599 F2d 65, 71-72 [5th Cir 1979], cert denied Georgia v Freeman, 444 US 1013, supra; State of Montana v Patterson, 203 Mont 509, 662 P2d *731 291, 293 [1983], supra; United States v Bagley, 473 US 667, 682-683.)
Not every nondisclosure of material requires reversal or vacatur of a conviction. It is only when such material would deprive defendant of a fair trial that the Constitution would be violated (United States v Agurs, 427 US 97, supra). Under the Federal Constitution, there is but a single standard to be applied. A new trial is required only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different” (United States v Bagley, 473 US 667, 682, supra). "Reasonable probability” means a " 'probability sufficient to undermine confidence in the outcome’ ” (supra).
In New York, the rule is multitiered. If the material which had been withheld was "specifically requested” then the test is whether said failure might have affected the outcome. (People v Vilardi, 76 NY2d 67, 73, supra.) If there was merely a "general request” or "no request” for the undisclosed information, then the test is whether "there is a reasonable probability that the outcome of the trial was affected” (People v Nedrick, 166 AD2d 725, 727, lv denied 77 NY2d 842; People v Brown, 162 AD2d 333, 335, lv denied 77 NY2d 836; People v Smyers, 167 AD2d 773, 775, lv denied 77 NY2d 967).
In this case, neither side has addressed whether this is a "specific request” case or a "general” or "no” request case. Since the burden is on the defendant to prove each element of his claim, the court will apply "reasonable probability” criteria.
In this case, defense did not know that it was Detective Dugan’s expert opinion that the fire was accidental and was an electrical fire.
Had defense counsel known this fact, his trial strategy would have, in all reasonable probability, changed. Instead of calling Detective Dugan a "wind bag” or a "con man”, defense would have reasonably requested the jury to believe Detective Dugan’s expert opinion. In fact, it was the prosecutor in this case who urged the jury to believe Dugan’s expert opinion.
There were two possible and equally reasonable and possible successful trial strategies that this would have engendered. Defense could have argued that whether one believed Detective Dugan’s or Fire Marshal King’s testimony, there would be no evidence corroborating defendant’s confession. If Detective Dugan is believed, the People would have failed to corroborate *732 the corpus delecti of the crime of arson. If Fire Marshal King’s testimony is believed, then the fire could not have been started from the roof, and defendant’s confession would have been discredited.
There is a "reasonable probability” that this court may well have granted a defense motion for order of dismissal, because defendant’s confession had not been corroborated. (See, People v Reade, 13 NY2d 42; People v Anderson, 80 AD2d 33.) Even if the court would not have granted the dismissal motion, there would have been "reasonable probability” that the jury verdict would have been different.
The second alternative trial strategy would have been to pit the credibility of Detective Dugan against that of Fire Marshal King and argue to the jury that Detective Dugan is more credible than Fire Marshal King. There is also a reasonable probability that this would have been successful, since the trial jury on this case, in fact, believed Detective Dugan’s expert testimony. As the Court of Appeals noted in this case, the only testimony corroborating defendant’s conviction was Detective Dugan’s expert opinion. Thus, since the first jury believed Detective Dugan, there is a reasonable probability that had Detective Dugan given his expert opinion that the fire was accidental, they would also have believed him.
Under the facts of this case, where the prosecutor knew of Detective Dugan’s expert opinion or where Dugan had a Brady duty to disclose his opinion, the court believes that there is a "reasonable probability” that had the jury been informed of the withheld information, the verdict would have been different. This alone violated defendant’s fair trial and due process rights. It was society who was the loser when the jury did not hear Detective Dugan’s opinion.
Not only was Detective Dugan’s expert opinion withheld, but other facts which this court has previously enumerated, were undisclosed to defense. These unknown facts must be combined with defense’s known facts, in order to determine whether there was a "reasonable probability” that defense strategy would have changed and that with the new strategy, there would have been a "reasonable probability that the outcome of the trial would have been different” (United States v Bagley, 473 US, supra, at 682; People v Nedrick, 166 AD2d, supra, at 727).
In this case, the defense team did not know that Detective Dugan believed that the fire was accidental and that he *733 believed that the fires under the stairway were set after the extinction of the blaze and were most probably set by the Fire Department. The report indicating that the fire persons at the fire were probably negligent was unknown. Defense lacked information that King did not discover the critical fire until two to three weeks after the fire which was of significance. Adding this to the known fact that the critical board found in the men’s room contained no accelerant, the court finds that there is a reasonable probability that defense strategy would have been different had all the unknown information been known.
Defense strategy would have been to show that Detective Dugan’s accidental fire theory was accurate and the only testimony showing arson would have been based on the fires set by the Fire Department itself, and "tampered evidence”. Since it was the Fire Department that withheld the opinion that the fire was arson and they had a motive to cover up their negligence, the jury would, in all "reasonable probability”, have disregarded the testimony of Fire Marshal King, that the fires were deliberate in nature. Of course, even if the Fire Department was believed, the fire could not have happened in the manner described by defendant’s confession.
Known facts when taken in conjunction with undisclosed information, lead the court to conclude that there is a "reasonable probability” that defense strategy would have changed and that the new strategy would have affected the outcome of the trial. Of course, all this information was unknown to the jury and they could not weigh these factors.
The court has also previously enumerated other undisclosed material and other disclosed material. However, even in conjunction with these facts, they do not in and of themselves, constitute grounds for setting aside the verdict. However, when added to the facts above, lend additional weight in the reasonable probability determination.
The court finds that society was the loser in this trial. The jury had but a small part of the information necessary for determination of defendant’s guilt or innocence. A fair trial was not had on this matter and the court finds that there was a Brady violation requiring the granting of the motion and the setting aside of the verdict.

ROSARIO

The court has also considered the Rosario claim herein (People v Rosario, 9 NY2d 286, rearg denied 9 NY2d 908, cert denied 368 US 866, supra).
*734 As stated earlier, a former prosecutor destroyed the notes of interviews with Detective Dugan and other witnesses. This court has found that these notes contained Detective Dugan’s opinion that the fire was accidental, and the fires under the stairway were set after the main fire was put out. Those materials also contained the fact that Detective Dugan believed that the stairway fires were set by the Fire Department.
Prosecutor’s notes of interviews with witnesses is Rosario material (People v Bell, 140 AD2d 937; People v Cavallerio, 71 AD2d 338). The People have a duty to "exercise due care in preserving Rosario material.” (People v Wallace, 76 NY2d 953, 955, supra; People v Spivey, 177 AD2d 216, 220.)
Where Rosario material is destroyed, defendant has the burden of showing prejudice in order to be entitled to any sanction. (People v Martinez, 71 NY2d 937.) Where the destruction of Rosario material is shown on a CPL article 440 motion, defendant must also show that there would have been a "reasonable possibility” that the result of the trial would have been affected by the destruction. (People v Jackson, 78 NY2d 638, 649.)
It is noted that in this case the destruction of the Rosario material was deliberate and part of a policy on the part of the prosecutor. In this case, had the court known of the destruction of the Rosario material, a sanction against the prosecutor would have been required (People v Wallace, 76 NY2d 953, supra). At minimum, an unfavorable inference would have been given to the jury to the effect that the notes were destroyed, would not have been favorable to the People on the issue of whether the fire was arson in nature, and who set the fire beneath the stairway. This Rosario violation must be added to the Rosario violation originally found by the court, i.e., that Fire Marshal King did not discover the fourth fire until two or three weeks later. Adding this together, the court finds that there is a reasonable possibility that the Rosario violations affected the result of the trial.
In determining the Rosario violation, the court did not consider either material which may be double hearsay (People v Williams, 165 AD2d 839, 841, affd 78 NY2d 1087) or material which is unattributable to a witness (People v Miller, 183 AD2d 790).
While this court has not considered unattributable material, the court has some reservations as to the precise parameters *735 of the Rosario rule. In a concurring opinion in People v Adger (75 NY2d 723, 731) Judge Titone wrote for himself and Judge Hancock, Jr., the following: "Finally, I reject the People’s contention that these documents are not Rosario material because they contain 'information’ which is not attributed to any specific witness. Indeed, in Consolazio this court specifically noted that '[t]he character of a statement is not to be determined by the manner in which it is recorded, nor is it changed by the presence or absence of a signature. ’ (40 NY2d 446, 453 [emphasis supplied].) The absence of attribution may impair defense counsel’s ability to effectively use this material at trial, but counsel is nonetheless entitled to see the material so that he can determine its worth to the defense (see, People v Jones, supra, at 550-552).”
In contrast, in People v Young (79 NY2d 365), Judge Titone wrote that Rosario relates only to material of specific witnesses. The Court remanded the Young case for determination as to who made the statement. Implicit in the remand is a belief that unattributed Rosario material does not come under the rule.
Notwithstanding the second seemingly inconsistent position taken by Judge Titone, the court is bound by stare decisis to follow People v Miller (183 AD2d 790), which holds that unattributable material is not a Rosario violation.
The court finds that the destroyed Rosario material when added to the undisclosed material regarding Fire Marshal King, constitutes a violation of Rosario, under the guidelines set forth in this case by the Court of Appeals on postconviction, postfinal appeal motions.
As stated by Mr. Justice Monserrate in People v Bianco (153 Misc 2d 509, 515 [Sup Ct, Cayuga County]) "it is implicit in the rule which it promulgated [the Court of Appeals] that a reviewing court should assess the cumulative effect of any/all Rosario violations on the verdict, rather than to view each error in isolation and if no single violation seems enough then to deny a defendant’s motion”.
I therefore find a "reasonable possibility” that the outcome would have been different had the defense known the Rosario information.
INEFFECTIVE ASSISTANCE OF COUNSEL
The court is extremely troubled by what it has learned of counsel’s performance in this case. However, in light of the *736 court’s determination on the Brady and Rosario issues, the court will not decide this issue.
As an aside, I must take this opportunity to echo the cry for truth and justice as articulated by Mr. Justice Collins. In People v Ramos (NYLJ, June 3, 1992, at 24, cols 3-4) Justice Collins decided a CPL article 440 motion case which has the same overtones as the one before me, his language is elegant. The words, "The greatest crime of all in a civilized society is an unjust conviction. It is truly a scandal which reflects unfavorably on all participants in the criminal justice system * * * No one is entitled to a perfect trial but everyone is entitled to a fair trial. This Court finds that Ramos [Jackson] did not receive that fair trial. The pity is that it took seven [11] years to reach this result.”
DECISION AND ORDER
The motion to vacate defendant’s judgment of conviction is granted. The conviction is vacated. A new trial shall be held as soon as possible.

. Some of the documents introduced into evidence at this hearing indicate that this statement was false, and that the prosecutor knew that this statement was false. The prosecutor, however, did nothing to correct this inaccurate statement by Fire Marshal King (see, People v Pelchat, 62 NY2d 97).

. This court has made this finding so that the record will be complete. It is, however, unnecessary to the ultimate conclusion of this case. As will be shown later, whether Detective Dugan told anyone of his opinion or whether the prosecutor knew about Dugan’s opinion, is irrelevant as to the existence of a Brady violation.

. Although defense counsel argued on January 6, 1992 that it was King who stated that no accelerant was found on the wooden temporary support, the document cited by defense counsel indicates that the information came from an ATF report which was disclosed to defense counsel.