514 S.E.2d 320

**Harold GIBSON, Respondent/Petitioner,**

**v.**

**STATE of South Carolina, Petitioner/Respondent.**

**No. 24914.**

Supreme Court of South Carolina.

Submitted Jan. 21, 1999.

Decided March 8, 1999.

516

Tara Dawn Shurling, of Columbia, for respondent/petitioner.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Teresa A. Knox, and Assistant Attorney General Matthew M. McGuire, all of Columbia, for petitioner/respondent.

WALLER, Justice:

Respondent–Petitioner Harold Gibson (Gibson) pleaded guilty to voluntary manslaughter and was sentenced to twenty-one years in prison. He did not appeal the conviction or sentence.

Gibson filed a post-conviction relief (PCR) application dated March 2, 1995. A circuit judge granted Gibson a new trial based on a *Brady*[1] violation, but rejected Gibson's argument the prosecutor had committed misconduct. Petitioner–Respondent (the State) and Gibson contend the judge erred. We affirm in part and reverse in part.

## FACTS

The State accused Gibson of murdering a long-time friend, Bobby M. Griffin (victim), in a late-night shooting at Gibson's bar in 1989. From the beginning, Gibson claimed the shooting was an accident. He and other witnesses told police he fired a nine-mm automatic handgun into the wall of his bar to subdue the victim, who had been drinking, and convince everyone to leave. Gibson told police everyone left, then the victim went back inside the bar to confront Gibson again. Gibson suspected the victim was armed. Gibson, holding the handgun only by the butt and not the trigger, slapped the victim on the forehead with the gun. The gun fired; a bullet struck the victim in the forehead and killed him.

The key evidence consisted of the testimony of two alleged eyewitnesses, Robert Peterson and Anna Lanier Ross. Peterson told police he followed the victim and Gibson back into the bar after Gibson had ordered everyone to leave. Peterson corroborated Gibson's version of events, particularly the statements that the gun went off after Gibson struck Griffin with it.

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Ross, who was the victim's girlfriend, told police she went to a window and looked inside after the victim went back into the bar. She claimed she "saw [Gibson] point the pistol at [the victim] and shoot him."

Four other witnesses told police that Ross either was sitting in her car or standing next to it when the fatal shot was fired. She ran inside only after the shot was fired to find the victim dying on the floor, according to the witnesses.

Gibson filed a discovery motion pursuant to *Brady* and Rule 5, SCRCrimP. Gibson pleaded guilty after a jury had been selected, which resulted in the prosecutor describing the statements of Peterson and Ross to the judge. The prosecutor said Peterson told police the gun discharged after Gibson struck the victim with it. The prosecutor said that "another witness, [Ross], was outside and indicates that she saw a different version with the defendant having pointed the gun at the victim's head." The prosecutor did not reveal any changes Ross had made in her story or any misgivings about the veracity of her potential testimony. Petitioner pleaded guilty to voluntary manslaughter after answering the usual questions regarding his constitutional rights.

In February 1992, the victim's family sued an insurance company in an effort to collect under an accidental death provision of the victim's life insurance policy. Gibson learned for the first time through the testimony of investigating officers that they and the prosecutor had visited the crime scene with Ross. Gibson also learned the officers did not believe Ross's statement that she saw the shooting through the window because her view would have been blocked by curtains and a Donkey Kong video game.

Ross testified in the civil trial that she opened the *door* of the bar to see Gibson point the gun at the victim and shoot him. Three witnesses told the jury the same thing they had told police during the investigation, i.e., that Ross was either in or beside her car when the shooting occurred and could not have seen what happened inside the bar. In addition, it was raining and sleeting that night, and the door of the bar was equipped with a device that automatically closed it.

Gibson testified in the civil trial that he repeatedly tried to calm the victim, who had been his friend and a fellow logging

truck driver for twenty years, and make him leave the bar peacefully. When the victim came back inside the bar, Gibson believed he was armed because the victim kept his hand down by his side. Gibson grabbed his handgun by the butt and hit the victim on the left side of his head, hoping to "knock some sense into him." He was shocked when the gun discharged because he had not pulled the trigger. Gibson held the victim in his arms until he died a few minutes later.

At the PCR hearing, petitioner's trial attorney testified he visited the crime scene with Gibson. The attorney was fully prepared to impeach Ross in an effort to discredit her claim that she had witnessed the shooting through the window. He recognized, however, that determining how the shooting occurred was a factual issue for the jury. The attorney testified he knew police and prosecutors did not believe Ross's statements were credible, but did not recall receiving any information that the prosecutor had taken Ross to the scene to discuss her statements. In his estimation, the investigating officers and the prosecutor simply confirmed his belief that Ross was not credible.

The trial attorney's co-counsel testified he visited the scene with the attorney and Gibson to collect evidence to discredit Ross's claims. At the time of Gibson's guilty plea, the co-counsel did not know police and the prosecutor did not believe Ross's claims; nor did he know they had taken Ross to the scene to confront her.

The prosecutor testified that, after confronting Ross at the scene, there

> came a time when I was convinced that she could not see what she said she saw from where she said she saw it. She said she was standing at a window looking in the bar. And we looked at some pictures and there was a Donkey [Kong] machine in front of that window when the pictures were taken of the scene that night and we determined that she could not have seen through that window. And I confronted her with that and she never denied seeing what she said she saw in the bar. She then began to hedge on where she was standing. She said, well, maybe I wasn't there, maybe I was at the door or something to that effect. She still said she saw what she saw and she never wavered on that.

The prosecutor testified he told Gibson's attorney that Ross could not have seen what she claimed. The prosecutor did not recall whether he also told Gibson's attorney that he had reached his conclusion after confronting Ross at the scene and hearing her change her story. When pressed further, the prosecutor testified he could not recall exactly when Ross changed her story. He did not document the changes to Ross's previous statement in writing. If the case went to trial, the prosecutor intended to offer Ross's testimony, then place an investigator from his office on the stand to testify that a person could not see inside the bar through that window.

Two investigating officers testified, as they had at the civil insurance trial, that they did not believe Ross could have seen the shooting through the window. They corroborated the prosecutor's testimony about confronting Ross at the scene and her continued insistence that she saw the shooting. However, the officers did not recall Ross ever changing her statement to say she must have seen the shooting through the door. Neither officer told Gibson's attorney verbally or in any written report given to the attorney that they had taken Ross to the scene.

Gibson testified he struck the victim with the gun and it fired accidentally. He believed the prosecutor planned to use Ross's testimony at trial. He knew Ross was lying, but had no way of proving it. His attorney said he thought he could prove Ross was lying, but no one ever told him that Ross had changed her statement to say she must have seen the shooting through the door after the prosecutor and police confronted her at the scene. Nor did anyone ever tell Gibson that the prosecutor and police were convinced she was lying, Gibson testified. If he had known those facts, he would have stood trial instead of pleading guilty, Gibson testified.[2]

2. In other testimony at the PCR hearing, Gibson's wife and sister testified that Gibson's attorney told them that Ross's testimony would be "very damaging." The attorney also told them that Peterson, the other eyewitness, would not be credible because he had suffered a stroke and short term memory loss.

Two pathologists, including the one who performed the autopsy, testified they found nothing that would conflict with Gibson's version of events. Gibson's handgun did not have safeguards used on newer models to prevent such accidental firings, although Gibson was unable

The PCR judge, after considering oral arguments as well as memoranda from both parties, ruled the State had violated *Brady* by failing to fully disclose all material exculpatory or impeachment evidence regarding Ross's statements. The prosecutor should have disclosed the visit to the scene with Ross and the material change in her testimony. The judge ruled that

> [t]his information was material regardless of defense counsel's independent knowledge of the physical parameters of the crime scene. Defense counsel could have challenged [Ross's] veracity merely on the basis of the measurements he had taken himself. However, the withheld information provided an infinitely stronger basis for challenging the prosecution's key witness and for exculpating the defendant.... Only in its full form did the information constitute evidence with exculpatory or impeachment value. By contrast, the information actually provided, that the prosecution believed [Ross] could not have seen through the window, was inadmissible into evidence and thus, inherently lacking in exculpatory or impeachment value.... [T]here is a grave difference between thinking you can impeach a witness and knowing that the State has established that the witness's sworn statements are untrue.

The PCR judge set aside Gibson's guilty plea and granted him a new trial based on the *Brady* violation. The judge also ruled the prosecutor had not committed misconduct.

## ISSUES

1. Does probative evidence support the PCR judge's ruling that Gibson is entitled to a new trial on the basis of a *Brady* violation?

2. Does probative evidence support the PCR judge's ruling that the prosecutor did not commit misconduct?

### 1. BRADY VIOLATION

The State contends the PCR judge erred in granting Gibson a new trial on the basis of a *Brady* violation. The State

---

to find an expert who could definitively testify the gun accidentally fired as he said it did.

asserts that Gibson's attorney believed he could effectively impeach Ross and had told Gibson so. "Based on the testimony at the PCR hearing, it is clear that the outcome of the proceedings would not have changed; [Gibson] would not have proceeded to trial even if the solicitor specifically informed defense counsel that the State's witness had been taken to the crime scene," the State argues. Gibson pleaded guilty because he knew he would receive no less than a voluntary manslaughter conviction if he stood trial, the State contends. We disagree.

A defendant who pleads guilty usually may not later raise independent claims of constitutional violations. *See Rivers v. Strickland*, 264 S.C. 121, 124, 213 S.E.2d 97, 98 (1975) (stating "[t]he general rule is that a plea of guilty, voluntarily and understandingly made, constitutes a waiver of nonjurisdictional defects and defenses, including claims of violation of constitutional rights prior to the plea"). However, "a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case." *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir.1995); *accord Gustine v. State*, 325 S.C. 123, 127–28, 480 S.E.2d 444, 446 (1997) ("waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences").

When a defendant lacks knowledge of material evidence in the prosecution's possession, the waiver of constitutional rights cannot be deemed knowing and voluntary. *Sanchez*, 50 F.3d at 1453; *accord White v. United States*, 858 F.2d 416, 420–22 (8th Cir.1988) (adopting same principle); *Miller v. Angliker*, 848 F.2d 1312, 1319–20 (2d Cir.1988) (adopting same principle); *Royal v. Netherland*, 4 F.Supp.2d 540, 566 (E.D.Va.1998) (stating same principle); *New York v. Burney*, 169 Misc.2d 436, 642 N.Y.S.2d 990, 992 (Sup.Ct.1996) (collecting cases and noting the federal trend permitting defendants to pursue such claims even though *Brady* and its progeny do not address the withholding of *Brady* material prior to the entry of a guilty plea).

"The government's obligation to make such disclosures [of *Brady* material] is pertinent not only to an accused's

preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government." *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998). Accordingly, Gibson may challenge the voluntary nature of his guilty plea in a PCR action by asserting an alleged *Brady* violation. *E.g., Carter v. State,* 329 S.C. 355, 495 S.E.2d 773 (1998) (illustrating an applicant may challenge the voluntary nature of a guilty plea in a PCR action).

■ A *Brady* claim is based upon the requirement of due process. Such a claim is complete if the accused can demonstrate (1) the evidence was favorable to the accused, (2) it was in the possession of or known to the prosecution,[3] (3) it was suppressed by the prosecution, and (4) it was material to guilt or punishment. *Kyles v. Whitley,* 514 U.S. 419, 432–42, 115 S.Ct. 1555, 1565–69, 131 L.Ed.2d 490, 505–10 (1995); *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218; *State v. Von Dohlen,* 322 S.C. 234, 241, 471 S.E.2d 689, 693 (1996). This rule applies to impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985); *State v. Von Dohlen, supra.*

■ Gibson's case falls into the third of three distinct categories of *Brady* violations identified by the Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Those categories are (1) cases that include nondisclosed evidence of perjured testimony about which the prosecutor knew or should have known, (2) cases in which the defendant specifically requested the nondisclosed evidence, and (3) cases in which the defendant made no request or only

---

**3.** *Brady* and its progeny place the burden upon the prosecutor to know all the relevant facts of a case in order to decide what information to disclose as exculpatory or impeachment evidence. *Kyles v. Whitley,* 514 U.S. 419, 436–40, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490, 508 (1995) (prosecutor can establish procedures and regulations to carry the State's burden of disclosure and to ensure communication of all relevant information on each case to every lawyer who deals with it); *accord State v. Von Dohlen,* 322 S.C. at 240, 471 S.E.2d at 693 (information known to investigative agencies may be imputable to prosecutor, but prosecutor has no duty to go on fishing expedition to find exculpatory or impeachment evidence).

a general request for *Brady* material. *Id.* at 103–107, 96 S.Ct. at 2397–99, 49 L.Ed.2d at 349–52. Gibson's pre-trial *Brady* motion requested "[a]ll information of whatever form . . . which tends to exculpate the defendant either through the potential impeachment of any State witness and all information of whatever form . . . which may lead to evidence which tends to exculpate the defendant . . . or impeaching the credibility of any potential State's witness. . . ."

In "specific request" and "general- or no-request" situations, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley,* 514 U.S. at 432–36, 115 S.Ct. at 1565–66, 131 L.Ed.2d at 505–06 (internal quotes omitted); *accord State v. Von Dohlen,* 322 S.C. at 241, 471 S.E.2d at 693.[4] The court must consider the suppressed evidence collectively, not on an item-by-item basis. *Kyles v. Whitley,* 514 U.S. at 436–38, 115 S.Ct. at 1567, 131 L.Ed.2d at 507.

■ The standard for deciding the materiality of a *Brady* violation in the context of a guilty plea is a novel issue in South Carolina. We adopt the standard applied by other courts, which essentially is the same standard that is applied in the context of a trial: A *Brady* violation is material when there is a reasonable probability that, but for the government's failure to disclose *Brady* evidence, the defendant would have refused to plead guilty and gone to trial. *See Sanchez v. United States,* 50 F.3d at 1454; *Banks v. United States,* 920 F.Supp. 688, 692 (E.D.Va.1996) (noting that Second, Sixth,

---

4. A defendant who alleges a *Brady* violation in the first category, the prosecutor's use of perjured testimony, must clear a lower hurdle in proving materiality. In such situations, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the jury." *United States v. Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381–82, 87 L.Ed.2d at 492. That category is not at issue in Gibson's case.

Eighth, and Ninth Circuit Courts of Appeal have adopted such a view).[5]

The overriding theme of the *Brady* cases is the emphasis the Supreme Court has placed on the prosecutor's responsibility for fair play. In close cases, "the prudent prosecutor will resolve doubtful questions in favor of disclosure. This is as it should be. Such disclosures will serve to justify trust in the prosecutor as the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done. And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles v. Whitley,* 514 U.S. at 438–40, 115 S.Ct. at 1568, 131 L.Ed.2d at 509 (quotes omitted) (citing *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

We hold the PCR judge correctly ruled that the prosecutor violated *Brady* by failing to disclose fully the change in Ross's testimony and the on-the-scene confrontation. *See Cherry v. State,* 300 S.C. 115, 386 S.E.2d 624 (1989) (appellate court must affirm PCR judge's findings when they are supported by any evidence of probative value).

The record reveals that the prosecutor told Gibson's attorney that Ross could not have seen what she claimed, i.e., that Gibson pointed the gun at the victim and fired. The investigating officers told Gibson's attorney they had reached the same conclusion. Gibson knew his attorney believed he could impeach Ross's testimony.

Neither the prosecutor nor the detectives, however, disclosed to Gibson that Ross had changed her statement to say that, even if she had not seen the shooting from the window, she must have seen it through the door. Nor did they reveal

---

**5.** The *Sanchez* standard also is similar to the ordinary PCR standard for determining whether a guilty plea should be set aside due to the ineffective assistance of counsel. *E.g., Alexander v. State,* 303 S.C. 539, 402 S.E.2d 484 (1991) (where there has been a guilty plea, the applicant must prove counsel's representation fell below the standard of reasonableness and, but for counsel's unprofessional errors, there is a reasonable probability he would not have pleaded guilty and would have insisted on going to trial) (citing *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)).

the on-the-scene confrontation that prompted Ross to change her previous statement.

In applying the *Brady* analysis, first, the withheld evidence was favorable to Gibson because it was additional proof of Ross's alleged lies. Second, the evidence was in the possession of and known to the prosecutor. Third, the prosecutor suppressed the evidence by failing to reveal it.

Finally, as to the prong upon which *Brady* violations often rise or fall, we agree with the PCR judge's ruling that the withheld evidence was material. It is reasonably probable that, had the prosecutor revealed the suppressed information, Gibson would have chosen to stand trial instead of pleading guilty. Instead of merely hoping he could impeach Ross as a liar, Gibson would have known about Ross's inconsistent statements and the revealing on-the-scene confrontation. He likely could have challenged the prosecutor's effort to put her on the stand as the impermissible solicitation of perjured testimony. *Compare Banks v. United States*, 920 F.Supp. at 691–93 (finding it was reasonably probable that defendant would have stood trial if he had known the government's key witness had enjoyed conjugal visits with his wife and girlfriend in government offices) *with United States v. Avellino*, 136 F.3d at 254–59 (finding it was not reasonably probable that defendant would have stood trial if prosecutors had given him additional undisclosed evidence about informant's narcotics trafficking, where prosecutors already had turned over extensive information about informant's atrocious criminal record that included nine murders, narcotics offenses, extortion, hijacking, and burglary).

█ We also agree with the PCR judge's ruling that the information actually provided, the prosecutor's *conclusion* that Ross could not have seen what she claimed, was of little help to Gibson. That conclusion inherently lacked exculpatory or impeachment value because it was not admissible at trial. The *Brady* analysis focuses upon *facts* known to the State, not the prosecutor's conclusions.

## 2. PROSECUTORIAL MISCONDUCT

█ Gibson contends the PCR judge erred in ruling that, although the prosecutor committed a *Brady* violation, he did

not commit misconduct. The prosecutor described Ross's potential testimony, which he knew to be a lie, to the judge at the guilty plea without revealing his reservations about Ross's veracity, his visit to the scene with her, or inconsistencies in her statements, Gibson asserts. Any use of Ross's testimony at trial would have constituted a use of perjured testimony in violation of ethical rules, Gibson argues.

As explained above, the prosecutor committed a *Brady* violation by not disclosing certain evidence to Gibson. A *Brady* violation is one type of prosecutorial misconduct. It is misconduct of a different type than, for instance, an attempt to introduce inadmissible evidence, tamper with the jury, or some other inappropriate action. *E.g., United States v. Alderdyce*, 787 F.2d 1365, 1370 (9th Cir.1986) (finding no evidence of prosecutorial misconduct giving rise to a *Brady* violation); *Buffington v. Copeland*, 687 F.Supp. 1089, 1095–96 (W.D.Tex. 1988) (distinguishing *Brady* violations from other types of prosecutorial misconduct in which, for example, a prosecutor tries to inject prejudice into a trial by introducing inadmissible evidence or making inappropriate opening statements or closing arguments).

■■■ It does not matter whether the prosecutor's misconduct in failing to reveal *Brady* evidence is due to negligence or an intentional act because a court may find a *Brady* violation irrespective of the good faith or bad faith of the prosecutor. "*Brady* is based on a sense of fairness, and a belief that society gains when a defendant is accorded a fair trial. The focus is not on the misconduct of the Prosecutor, but on the fairness of the procedure." *New York v. Jackson*, 154 Misc.2d 718, 593 N.Y.S.2d 410, 417 (Sup.Ct.1992). As the Supreme Court explained in *Brady*, "[t]he principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair[.]" *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. at 110, 96 S.Ct. at 2401, 49 L.Ed.2d at 353.

The PCR judge's ruling in this case is inconsistent because the prosecutor committed misconduct by violating *Brady*.

Accordingly, we reverse the judge's ruling on this issue.[6] We note that when a *Brady* violation is found, it is unnecessary for the judge to make an additional ruling on prosecutorial misconduct unless the prosecutor engaged in other types of misconduct not related to the *Brady* violation.

## CONCLUSION

We affirm the PCR judge's decision to set aside Gibson's guilty plea and grant him a new trial based on the *Brady* violation. We reverse the PCR judge's erroneous ruling on the issue of prosecutorial misconduct.

AFFIRMED IN PART; REVERSED IN PART.

FINNEY, C.J., TOAL, MOORE, and BURNETT, JJ., concur.

---

6. Our use of the term "misconduct" in the context of a *Brady* violation is not necessarily synonymous with misconduct as defined in various ethical rules that govern lawyers. *See* the Rules of Professional Conduct contained in Rule 407, SCACR. The focus of the *Brady* analysis is upon the fairness of the procedure followed in a particular case. The focus of the ethical rules is upon a lawyer's alleged misconduct, an issue that is not before us.