631 S.E.2d 70

**Ernest Matthew RIDDLE, Petitioner,**

v.

**Jon OZMINT, Director, South Carolina Department of Corrections, Respondent.**

No. 26153.

Supreme Court of South Carolina.

Heard Feb. 1, 2006.
Decided May 22, 2006.

Diana L. Holt and Teresa L. Norris, both of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia, for Respondent.

PER CURIAM.

We granted certiorari to consider a post-conviction relief (PCR) order denying relief to petitioner, a death row inmate. We find the solicitor's office violated *Brady v. Maryland*[1] when it suppressed certain evidence involving witness Jason Riddle (Jason), and that that office violated petitioner's due process rights when it failed to correct misstatements made by Jason while testifying against petitioner. *See Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The

---

1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

PCR order denying petitioner relief is reversed, and the matter remanded for further proceedings.

## FACTS/PROCEDURAL HISTORY

In the early morning hours of August 8, 1985, Mrs. Abby Sue Mullinax was murdered in her home when her throat was cut. Nineteen-year-old petitioner and his seventeen-year-old brother Jason were arrested on August 20, based on information supplied by their older brother, Bruce. On August 22, Jason gave a statement confessing that he and petitioner [2] had entered the home through a window, that he had stolen money from a purse on a dresser, and that petitioner had cut Mrs. Mullinax's throat.

Petitioner was convicted of the murder, burglary, and armed robbery of Abby Mullinax and received a death sentence. There was no physical evidence connecting petitioner with the murder and robbery of Mrs. Mullinax. Rather, the State's case rested on the eyewitness testimony of petitioner's alleged accomplice, his mildly mentally retarded brother Jason, and the testimony of various witnesses concerning petitioner's statements after Mrs. Mullinax's death.

At the 1986 trial Jason testified against petitioner. Bruce, who had been staying with Jimmy and Tammy Lewis in their home near Mrs. Mullinax's, testified that petitioner had come to the Lewis home around 3 or 4 am on the 8th, panicky, covered with blood, and wet from the knees down. Bruce testified that later that day Jason and petitioner were seen with cash, and that when a news story about the murder came on TV, petitioner said, "we don't have to worry about that bitch anymore." Tammy Lewis testified and confirmed Bruce's story about the money and petitioner's statement.

Fourteen-year-old Jerry Walker testified that several days after the murder petitioner said, in a joking manner, that he had killed a woman before. Another witness, James Buster Smith, testified that he, Jerry, and petitioner had gone to a lake around August 12, and that petitioner told them he had

---

**2.** Years later Jason would recant petitioner's involvement and name Bruce as his accomplice.

known Mrs. Mullinax, and that she had had valuable possessions and money in her home.

Petitioner called his stepmother to testify that Bruce had admitted turning Jason and petitioner in for reward money. Petitioner also called Clifton Coker, the Lewis's neighbor, who testified that shortly after the murder occurred he heard other neighbors Ricky and Lisa Nuzum (also spelled Newsome) up on his porch knocking on his door. He then heard car doors slam as they drove away. The next day he and his roommate found what appeared to be drops of blood on their porch. They cleaned up the blood. Bloodhounds taken to the Mullinax home "tracked" to the area around the Lewis–Nuzum–Coker homes and not to the barn. Although the jury learned only that the State had used bloodhounds but not what trail they had followed, at the PCR hearing the State acknowledged that the dogs had tracked to the Lewis–Nuzum–Coker homes.

On appeal, the Court affirmed the murder conviction but set aside the death sentence. *State v. Riddle*, 291 S.C. 232, 353 S.E.2d 138 (1987). Following a 1987 resentencing proceeding, a second jury returned a death sentence, which was also reversed on direct appeal. *State v. Riddle*, 301 S.C. 68, 389 S.E.2d 665 (1990). In 1991, a third jury returned a death sentence which was affirmed. *Riddle v. State*, 314 S.C. 1, 443 S.E.2d 557 (1994).[3]

This PCR action involves the guilt phase of the 1986 trial and the 1991 resentencing proceeding. We address only the grave constitutional violations which occurred during the 1986 guilt phase, and which mandate reversal of the PCR order.

## ISSUES

1) Whether there is any evidence to support the PCR judge's finding that no *Brady* violation occurred?

2) Whether the PCR judge erred in concluding that the Solicitor's failure to correct Jason's false trial testimony did not require a new trial?

---

**3.** All three circuit court proceedings were prosecuted by then-Solicitor Holman A. Gossett, Jr, while petitioner was represented in all trial proceedings by Kenneth L. Holland.

44

## Scope of Review

 On certiorari, this Court must uphold the PCR judge's findings where they are supported by any evidence of probative value in the record. *Gibson v. State,* 334 S.C. 515, 514 S.E.2d 320 (1999). We are concerned here not with the routine PCR issue whether trial counsel was ineffective, but instead with the question whether prosecutorial misconduct denied petitioner's due process right to a fair trial. *Id.*

### 1. *Brady* violation

 An individual asserting a *Brady* violation must demonstrate that evidence: (1) favorable to the accused; (2) in the possession of or known by the prosecution; (3) was suppressed by the State; and (4) was material to the accused's guilt or innocence or was impeaching. *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Gibson, supra.* If a *Brady* violation is found to have occurred, PCR must be granted. *Gibson, supra.* Petitioner points to several instances of alleged *Brady* violations. We find it necessary to discuss only two.

 First, as noted above, Jason gave a statement confessing to his and petitioner's guilt on August 22, 1985. The first trial commenced on January 27, 1986. On January 22, 1986, Jason gave a second statement to police which petitioner contends was not disclosed to his attorneys. The PCR judge found that had petitioner's counsel interviewed the officer who took notes of the statement between January 22 and the start of the trial, they would have learned of this statement. The PCR judge therefore concluded that the January 22 statement was available to petitioner, and thus the State's failure to disclose this statement did not violate *Brady.* We disagree. Not only is it unrealistic to require petitioner and his attorneys to reinterview all officers and investigators in the days before the trial, but that is not what *Brady* requires. The burden is on the solicitor to disclose material evidence which is exculpatory or impeaching. *Gibson, supra.*

 The PCR judge also held that nothing in Jason's January 22 statement was material for *Brady* impeachment purposes. Evidence is material under *Brady* if there is a "reasonable probability" that the result of the proceeding

would have been different had the information been disclosed. *E.g., State v. Proctor,* 358 S.C. 424, 595 S.E.2d 480 (2004). The question is not whether petitioner would more likely have been acquitted had this evidence been disclosed, but whether, without this impeachment evidence, he received a fair trial "resulting in a verdict worthy of confidence." *Kyles v. Whitley, supra,* at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490.

There were several inconsistencies between Jason's original statement and his trial testimony, and the undisclosed January 22 statement. Among these differences were whether Jason or petitioner removed the window fan from the window before entering the home; whether the brothers both went to the bedroom or whether one went to the kitchen and the other to the bedroom; whether the victim's purse was found on a large or small dresser; whether Jason fell before or after he heard the victim getting up, and where he fell; where he was when he saw petitioner kill Mrs. Mullinax; what he saw or heard as he left the house; and whether they got $100 or $125.

The most glaring inconsistency is that in his January 22 statement, Jason claimed that a friend had picked the brothers up after the murder and given them a ride to the barn, whereas in his original statement and in his trial testimony he maintained the brothers had walked the approximately three miles from the Mullinax home to the barn. Before the commencement of the trial, officers questioned the person Jason identified as having given the brothers a ride, who denied having done so. The State therefore chose not to present any evidence of the brothers having been driven to the barn.

The impeachment value of this statement is clear. Either the brothers were given a lift or they were not: Jason could not have been telling the truth in all his statements. Moreover, without the automobile ride, it is difficult to conceive how the brothers were able to travel the three miles from the Mullinax home to the barn, and back to the Lewis's home, in the time between the murder and the time when Bruce testified they returned to the Lewis home.

Whether this statement alone was material under *Brady* is a close question. As we stated in *Gibson,* citing the United States Supreme Court:

The overriding theme of the *Brady* cases is the emphasis the Supreme Court has placed on the prosecutor's responsibility for fair play. In close cases, "the prudent prosecutor will resolve doubtful questions in favor of disclosure. This is as it should be. Such disclosures will serve to justify trust in the prosecutor as the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done. And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Kyles v. Whitley*, 514 U.S. at 438–40, 115 S.Ct. 1555, 131 L.Ed.2d 490 (quotes omitted) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Our judicial system relies upon the integrity of the participants. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000). In this case, a prudent solicitor would have chosen to disclose the January 22 questioning and the resulting statement.

When determining whether the suppression of more than one item of evidence was material under *Brady*, we consider the collective impact of the undisclosed evidence. *Kyles v. Whitley*, 514 U.S. at 436, 115 S.Ct. 1555, 131 L.Ed.2d 490. The second undisclosed evidentiary item in this case was the fact that on January 24, 1986, two days after Jason's second statement and three days before the trial commenced, several police officers, Solicitor Gossett, and the solicitor's assistant took Jason by automobile to the Mullinax home and from there retraced the route he and Ernest took to the barn. There were questions asked of Jason during this outing, although it is unclear whether any new information was gleaned. The defense was not informed of this trip.

The PCR judge concluded, among other things, that information relating to the trip was in the prosecutor's file and therefore available to the defense under the solicitor's "open file" policy. The evidence at trial, however, was that the solicitor's office maintained an unusual "open file" policy in that they removed not only work product, but also "other documents on a case-by-case basis." Even had a true "open file" policy existed, the existence of such a policy does not

negate the solicitor's *Brady* obligation. *Porter v. State,* Op. No. _____ (S.C. Sup.Ct. filed March 6, 2006). This is especially so where the "reconstruction" trip took place only three days before trial.

Jason was a young man of limited mental abilities: knowledge of this trip would have bolstered petitioner's contention that Jason was an unreliable witness who had to be coached, and whose testimony was not worthy of belief. Given the absence of any physical evidence tying petitioner to the Mullinax murder, the State's case rested almost exclusively on Jason's recounting.

The PCR judge's finding that the evidence of the January 22nd statement and the January 24 trip was not material under *Brady* is without evidentiary support in the record, and therefore is reversed.

### 3) *Failure to correct false testimony*

At the 1986 trial, Jason was asked more than once whether he had spoken about the case to anyone other than Officer Harris in August 1985 when he gave his first statement. Jason denied speaking with anyone other than his lawyers, neglecting to mention either the January 22, 1986 statement or the trip on January 24, 1986. The solicitor failed to correct Jason's false trial testimony.

The PCR judge found that the State did not violate due process by failing to correct Jason's false testimony because the State may have thought either that Jason misunderstood the questions or that he simply did not recall the recent events. Since the State did not know *why* Jason failed to testify truthfully, petitioner was found not to have met his burden of showing the State knowingly used perjured testimony.

We disagree. The issue is not why Jason failed to tell the truth: rather, it is why the solicitor, who knew Jason's testimony to be false, failed to correct it.

A "prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. U.S.,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The

failure to correct false evidence is as reprehensible as its presentation. *Washington v. State,* 324 S.C. 232, 478 S.E.2d 833 (1996). The PCR judge erred in concluding that the State was not obligated to correct Jason's false testimony, and in failing to hold that this violation of petitioner's due process rights required that he be granted a new trial.

## CONCLUSION

The Constitution requires only that a defendant receive a fair trial, not a perfect one. U.S. Const. Am. VI; *State v. Johnson,* 334 S.C. 78, 512 S.E.2d 795 (1999). Petitioner's trial was rendered fundamentally unfair by prosecutorial misconduct. No probative evidence exists in this record to support the PCR judge's findings and conclusion. Accordingly, the PCR order denying petitioner relief is

**REVERSED.**

TOAL, C.J., MOORE, BURNETT, PLEICONES, JJ., and Acting Justice BROOKS P. GOLDSMITH, concur.