# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Larry Durant, Appellant.

Appellate Case No. 2016-001264

———————

Appeal From Sumter County
Roger M. Young, Sr., Circuit Court Judge

———————

Opinion No. 27964
Heard May 9, 2019 – Filed May 6, 2020

———————

**AFFIRMED**

———————

E. Charles Grose, Jr., of Grose Law Firm, of Greenwood,
for Appellant.

Attorney General Alan Wilson and Assistant Attorney
General William F. Schumacher, IV, both of Columbia,
and Solicitor Ernest A. Finney, III, of Sumter, for
Respondent.

———————

**JUSTICE HEARN:** Appellant Larry Durant was convicted of second-degree
criminal sexual conduct (CSC) for sexually abusing a teenage girl in his church
office where he served as the pastor. Durant contends the trial court improperly
permitted the State to introduce evidence of prior sexual abuse allegations as
evidence of a common scheme or plan under Rule 404(b), SCRE, and that the State

committed a *Brady*[1] violation by failing to accurately disclose the criminal history of its witness. Applying the framework announced today in *State v. Perry*, Op. No. 27963 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 12), we affirm the admissibility of the girls' testimony. Additionally, while the State failed to disclose the criminal background information of its witness, we find this information was not material. Accordingly, we affirm Durant's conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Durant was the founder and lead pastor at Word International Ministries, a church in Sumter. He is a double amputee below his knees and is legally blind. In 2013, four teenage girls who belonged to the church accused Durant of sexually assaulting them. Two of the girls were cousins, another was a God-sister, and the fourth was a close friend. The State indicted Durant on one count of second-degree criminal sexual conduct with a minor, stemming from an alleged sexual battery against one of the girls, and three counts of third-degree criminal sexual conduct pertaining to conduct with the other three. However, the State only proceeded to trial on one count.

During jury selection, the trial court mistakenly advised the jury pool that Durant faced all of the indicted criminal sexual conduct charges and a forgery charge. Defense counsel immediately indicated he had "something to bring up at a later time," and the court held a sidebar. Afterwards, the court explained it erroneously listed the charges Durant faced and instructed the jury not to consider them. Following the jury's dismissal, counsel stated he appreciated the court's curative instruction, but was concerned the jury panel had been tainted. Counsel explained he was "definitely not [asking for] a mistrial," but he was requesting a continuance or a new jury panel. The State responded the court had given a curative instruction almost immediately and clearly stated the charges did not exist. The circuit court acknowledged the mistake was unfortunate but believed the curative instruction "took care of it," and accordingly, denied the motion for a continuance or mistrial.

Because the State sought to call the three other girls who alleged Durant had sexually abused them in a similar fashion, the court held a *Lyle*[2] hearing. According

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923).

to one, Durant began abusing her when she was 13. She noted that Durant would call her to his office in the back of the church, lock the door, and pray to change her sexual orientation and to protect her against contracting any diseases. She stated that Durant began with oral sex and progressed to vaginal intercourse. Finally, she testified that Durant had pink pigmentation on his penis.

A second girl testified that Durant began to abuse her when she was 18, and that he would pray for her to make sure she did not contract any diseases and to prevent any harm to her body. She contended Durant digitally penetrated her vagina, which evolved into vaginal intercourse after he said, "God was taking him to a new level." She also testified that Durant would stand behind her during intercourse. She noted that Durant told her that she likely would not be admitted to the college of her choice if she did not have sex with him.

A third girl testified that Durant began abusing her when she was about 14 or 15 years old, and that he would also pray that she would not contract any sexual diseases. Finally, a fourth girl testified that Durant began abusing her when she was 13. She also noted that Durant would pray with her before the abuse, and that his genitalia had pink discoloration. On one occasion when she was pregnant, she stated that Durant told her that he would "bump the seed out." After comparing the similarities and dissimilarities pursuant to *State v. Wallace*, 384 S.C. 428, 683 S.E.2d 275 (2009), the trial court ruled the girls could testify, as the court remarked, "[f]rankly, it's one of the more compelling 404(b) cases I've ever come across."

At trial, the girls testified, as well as another witness, Ulanda McRae, who is one of the girls' mother. McRae is also the daughter of Lizzy Johnson, a woman Durant previously dated. Durant contended that Johnson, who lived in a property purportedly owned by Durant around the time the allegations surfaced, forged a deed conveying that property to Johnson sometime earlier. When the allegations arose, a deed was recorded conveying the property back to Durant. The defense believed these fraudulent transfers served as a motive to fabricate the girls' allegations of sexual abuse. Defense counsel also stressed the lack of DNA, the fact that Durant was a double amputee and legally blind, suffered from erectile dysfunction, and had a chronic sexually transmitted disease that none of the alleged victims contracted.

Initially, the jury indicated they were at an impasse and that one juror refused to vote. The court gave an *Allen* charge and added that refusing to vote was not an option. Shortly thereafter, the jury found Durant guilty, and the court sentenced him to 20 years' imprisonment.

A few hours after sentencing, defense counsel received a call from McRae's ex-husband inquiring why he did not question McRae about her prior criminal convictions. Defense counsel did not believe McRae had a criminal background because the State previously had disclosed a report from the National Crime Information Center (NCIC) stating she did not have a criminal record. Counsel conducted a SLED CATCH search[3] using her name, date of birth, and social security number, which revealed numerous prior convictions under nine aliases for offenses such as shoplifting, fraudulent checks, and forgery spanning from 1991-2005.

Thereafter, Durant moved for a new trial, arguing the State's case was based entirely on credibility and the State's failure to disclose McRae's record prevented him from impeaching a critical witness or further developing his defense that Johnson stole the residence owned by Durant, thereby creating the need to fabricate the charges against him. The State responded it had run McRae's criminal history using the NCIC under the name "McCrae" rather than the correct spelling.[4]  The State argued its failure to disclose McRae's criminal history did not amount to a *Brady* violation because it was unaware she had one and, in any event, it was immaterial to Durant's guilt. Durant disagreed, asserting the State was in possession of the criminal history for *Brady* purposes because it could have run a proper search but failed to do so.

The circuit court found the State was not in possession of the evidence and that it would not have affected the outcome of the trial. While some of McRae's convictions were likely inadmissible, the court noted it may have allowed one or more into evidence that would have been favorable to the defense, but regardless, the case boiled down to whether the jury believed the testimony of the victim and the three other witnesses regarding assaults. Thereafter, Durant appealed to the court of appeals, which transferred the appeal to this Court pursuant to Rule 204(b), SCACR.

---

[3] The South Carolina Law Enforcement Division enables public CATCH searches, an acronym for "Citizens Access to Criminal Histories." SLED CATCH, https://catch.sled.sc.gov (last visited Sept. 5, 2019).

[4] The State later clarified it did not include McRae's social security number in the search because it was not in possession of that information at the time.

## ISSUES

I.     Did the trial court err by admitting testimony of other sexual assaults pursuant to the common scheme or plan exception under Rule 404(b), SCRE?

II.    Did the circuit court err in denying Durant's motion for a new trial based on a *Brady* violation?

## DISCUSSION

### I.    Rule 404(b), SCRE

We begin by noting this Court's opinion in *State v. Perry*, which overruled *Wallace* and clarified the proper analysis in determining whether prior acts are admissible pursuant to the common scheme or plan exception. *State v. Perry*, Op. No. 27963 (S.C. Sup. Ct. filed May 6, 2020) (Shearouse Adv. Sh. No. 18 at 12). The Court emphasized *Lyle's* "logical connection" test, whereby "[t]he State must show a logical connection between the other crime and the crime charged such that the evidence of other crimes 'reasonably tends to prove a material fact in issue.'" *Id.* at 30 (quoting *Lyle*, 125 S.C. at 417, 118 S.E. at 807). To prove a sufficient connection, the State must demonstrate that there is "something in the defendant's criminal process that logically connects the 'other crimes' to the crime charged." *Id.* at 27. This requirement filters permissible evidence of prior acts against veiled attempts to introduce propensity evidence. When the State seeks to present this evidence, its burden is a high one, as trial courts must employ "rigid scrutiny." *Id.* at 30. However, while the proper framework no longer reduces a Rule 404(b) analysis to mathematical exercise where the number of similarities and dissimilarities are counted, the common scheme or plan exception remains viable.

Accordingly, the question then becomes whether the admission of the other three girls' testimony can nonetheless be upheld under *Perry*. While the trial was conducted under *Wallace*—the parties argued for and against admissibility using that test and the trial court based its decision on it—we now determine whether the evidence would have been admissible under the framework in *Perry*. In answering this question, case law guides our analysis.

In *State v. McClellan*, 283 S.C. 389, 323 S.E.2d 772 (1984), this Court determined the trial court properly admitted evidence that a defendant had

committed previous acts of sexual abuse because the State showed a particularly unique method of committing the attacks.  The Court explained:

> All three daughters testified concerning the pattern of this and prior attacks.  According to them, these attacks commenced about their twelfth birthday, at which time Appellant began entering their bedroom late at night, waking them, and taking one of them to his bedroom. There he would explain the Biblical verse that children are to "Honor thy Father," and would also indicate he was teaching them how to be with their husbands.  The method of attack was common to all three daughters.

283 S.C. at 391, 323 S.E.2d at 773.  The Court concluded, "It would be difficult to conceive of a common scheme or plan more within the plain meaning of the exception than that presented by this evidence." *Id.* at 392, 323 S.E.2d at 774.

Because *McClellan* remains good law, we believe the prior acts here are admissible. Durant had a particularly unique method of committing his attacks common to all the girls.  While there were differences in their ages and the type of sex act, the method of his attack was more than just similar; instead, evidence of the prior acts "reasonably tend[ed] to prove a material fact in issue." *Lyle*, 125 S.C. at 417, 118 S.E. at 807. Durant exercised his position of trust, authority, and spiritual leadership to hold private prayer meetings with teen girls who had grown up in his church.  He told them he was praying for their health and good fortune, and represented that part of this process was touching them sexually and having intercourse.  Durant then warned the girls of misfortune if they refused or told anyone. Moreover, he used scripture as a means of grooming the children into performing sex acts, a striking parallel to the defendant in *McClellan*. Indeed, the trial court noted it was one of the more compelling cases of common scheme or plan evidence it had ever seen, and we agree. These facts demonstrate the requisite logical connection between the prior acts of sexual abuse and the one forming the basis of the crime charged.

## II.   *Brady*

Durant contends the trial court erred in declining to grant a new trial based on the State's failure to disclose the criminal history of one of its witnesses. The State asserts its failure to provide McRae's criminal history did not amount to a *Brady* violation because it was unaware that she had one, and regardless, the evidence was

immaterial because it did not impact the credibility of any of the four witnesses who testified about the sexual abuse Durant committed against them. The State asserts McRae was an immaterial witness whose testimony was cumulative to other evidence presented at trial, and further, Durant never alleged she was involved in the property dispute that caused the victims to report the abuse.

A *Brady* violation occurs when the evidence at issue is: 1) favorable to the accused; 2) in the possession of or known to the prosecution; 3) suppressed by the prosecution; and 4) material to the defendant's guilt or punishment. *Gibson v. State*, 334 S.C. 515, 524, 514 S.E.2d 320, 324 (1999). Such a violation is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id*. at 525, 514 S.E.2d at 325. In other words, the government's evidentiary suppression is so serious as to undermine confidence in the trial's outcome. *Id*. *Brady* applies to both impeachment and exculpatory evidence. *Id*. at 524, 514 S.E.2d at 324. Importantly, whether the prosecution acted in good or bad faith is irrelevant in determining whether a *Brady* violation occurred. *Brady*, 373 U.S. at 87.

In this case, the evidence was clearly favorable to Durant, as defense counsel could have used it to impeach McRae. Accordingly, we turn to the second element —that the State possessed the information.

Because of the absence of South Carolina case law on the possession element in this context, we are guided by decisions from two federal circuits. The Third and Fifth Circuits have held the failure to provide information that could be obtained through a NCIC search is a *Brady* violation. *United States v. Perdomo*, 929 F.2d 967, 969-73 (3d Cir. 1991); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding a *Brady* violation where the government did not conduct a NCIC search of one of its witnesses despite assigning no bad motive on the government). Because we find these decisions persuasive, we adopt the reasoning employed therein.

In *Perdomo*, the defendant sought a government confidential informant's criminal record. *Id*. at 968-69. The prosecution conducted an NCIC search, which revealed no prior charges or convictions, but elected not to request local records from the Virgin Islands. *Id*. at 971. When it came to light that the informant had a significant criminal record the day after trial, the defendant moved for a new trial, which the district court denied. *Id*. 968-69. The Third Circuit held the district court erred as a matter of law in concluding the prosecution had no duty to conduct the search and provide the information, and remanded for a new trial. *Id*. at 970-74. In

relevant part, the court recognized that "the prosecution, not the defense, is equipped with the resources to accurately and comprehensively verify a witness['s] criminal background." *Id*. at 973. Despite defense counsel's ability to obtain similar information through a public search, the court refused to shift the burden to the defense to obtain *Brady* information.

In *Auten*, the Fifth Circuit held the government violated Brady when it decided not to conduct a criminal background search on one of its own witnesses because of time constraints. 632 F.2d at 481. The government asserted that it could not suppress or withhold evidence that it did not know existed. The court rejected this approach, noting, "[W]e do not assign bad motive or bad faith to the prosecution. We do underscore, however, the heavy burden of the prosecutor to be even-handed and fair in all criminal proceedings." *Id.* at 481.

We have cited *Auten* with approval in the past by acknowledging that "information known to investigative or prosecutorial agencies may, under certain circumstances, be imputable to the State." *State v. Von Dohlen*, 322 S.C. 234, 240, 471 S.E.2d 689, 693 (1996), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019). While we have also not required the State to conduct a fishing expedition to discover exculpatory evidence, *see id.* at 241, 471 S.E.2d at 693, requiring the State to provide accurate criminal background information on its own witnesses hardly can be described as such. We recognize that some jurisdictions construe Brady's possession requirement narrowly. *See, e.g. United States v. Young*, 20 F.3d 758, 764-65 (7th Cir. 1994) (declining to impute prosecutorial knowledge of a witness' criminal history when the government diligently searched for that information). Some courts have excused the government's failure to disclose if the information is readily available to the public. *See State v. Nikolaenko*, 687 N.E.2d 581, 583 (Ind. Ct. App. 1997) ("[T]he State will not be found to have suppressed material information where that information was available to the defendant through the exercise of reasonable diligence."). However, we believe the better approach is to hold the State responsible for fulfilling its prosecutorial duties, including the duty to disclose under *Brady*.

This rule is sound, as faulting defense counsel for failing to discover material information about the State's own witnesses "breathes uncertainty into an area that should be certain and sure" because "[s]ubjective speculation as to defense counsel's knowledge or access may be inaccurate." *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 293 (3d Cir. 2016). Shifting the burden to defense counsel

lessens the State's duty to disclose exculpatory evidence and has the risk of adding an additional element to *Brady*. *Id.* ("Adding due diligence, whether framed as an affirmative requirement of defense counsel or as an exception from the prosecutor's duty, to the well-established three-pronged *Brady* inquiry would similarly be an unreasonable application of, and contrary to, *Brady* and its progeny."). We agree with the Third Circuit that "[a]ny other rule presents too slippery a slope." *Id.* at 292.

With this in mind, we move to the facts of this case. Defense counsel first realized that McRae had a criminal history after her ex-husband notified him immediately after trial. The ex-husband expressed bewilderment that defense counsel did not ask about McRae's prior convictions during trial. Thereafter, counsel obtained a SLED background search using McRae's name, date of birth, and social security number, which revealed numerous prior convictions under several different aliases. While we concede this demonstrates the information was publicly available after paying for a search, this does not end the inquiry. The government not only has greater resources, *Perdomo*, 929 F.2d at 973, but also exclusive access to the NCIC database.[5] Moreover, when the State discloses *Brady* material, the defense has the right to rely on its veracity. We find it entirely unreasonable to shift the burden to the defense to independently investigate the criminal background of each of the State's own witnesses when the State has affirmatively claimed that its witness does not have a criminal background. It is not incumbent on the defense to review the State's NCIC search for misspelled names. While we do not suggest any improper motive by the State, we will not undermine a defendant's due process rights by overlooking and immunizing the State's mistake. Accordingly, we hold as a matter of law that the State was in possession of McRae's criminal background information and failed to accurately disclose it. Nevertheless, to warrant a new trial, Durant must demonstrate the trial court abused its discretion in finding the information was immaterial, a burden he fails to satisfy. *State v. Bryant*, 372 S.C. 305, 316, 642 S.E.2d 582, 588 (2007) (reviewing a *Brady* violation for an abuse of discretion).

Initially, we note McRae's criminal history included several convictions, many of them over ten years old, so it is unlikely that most of them would have been admissible. While we agree with the trial court that McRae's conviction for obtaining a signature under false pretenses likely would have been admissible, the defense never suggested that McRae—as opposed to Johnson—forged the deed. Perhaps

---

[5] FBI Criminal Justice Information Services Division, *National Crime Information Center*, https://www.fbi.gov/services/cjis/ncic (last visited Sept. 5, 2019).

more importantly, the State presented cumulative evidence in the form of the girls' testimony. As a result, the jury had ample evidence supporting its verdict. Accordingly, Durant cannot demonstrate the evidence was material because there was not a reasonable probability the result of the proceedings would have been different. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) ("A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.").

## CONCLUSION

For the foregoing reasons, we affirm.[6]

---

[6] Durant also contended the trial court erred in denying his motion for a mistrial due to an allegedly tainted jury pool, and his motion for a new trial based on an unconstitutionally coercive *Allen* charge and cumulative error. We affirm these grounds pursuant to Rule 220(b) and the following authorities:

1) As to the alleged tainted jury pool, see *State v. Crim*, 327 S.C. 254, 257, 489 S.E.2d 478, 479 (1997) (noting a decision to grant or deny a mistrial is reviewed for an abuse of discretion and "[t]he power of the court to declare a mistrial ought to be used with the greatest caution"); *Id.* at 257, 489 S.E.2d at 479 ("An instruction to disregard objectionable evidence usually is deemed to have cured the error in its admission unless on the facts of the particular case it is probable that notwithstanding such instruction the accused was prejudiced."). Further, the evidence was cumulative, so any purported error was harmless. *State v. Wyatt*, 317 S.C. 370, 373, 453 S.E.2d 890, 891 (1995).

2) As to the *Allen* charge, see *Tucker v. Catoe*, 346 S.C. 483, 490, 552 S.E.2d 712, 716 (2001) ("Whether an *Allen* charge is unconstitutionally coercive must be judged in its context and under all the circumstances."); *Green v. State*, 351 S.C. 184, 194, 569 S.E.2d 318, 323 (2002) ("A trial judge has a duty to urge, but not coerce, a jury to reach a verdict."). It is apparent the trial court did not err in directing the juror to fulfill the oath he took at the outset of trial, as the court did not urge the jurors to vote in any specific way. Moreover, the court's suggestion that the jurors would have to deliberate for as long as they wanted to be there that evening does not render the charge coercive. *See Johnson v. Sam English Grading, Inc.*, 412 S.C. 433, 454-57, 772 S.E.2d 544, 554-57 (Ct. App. 2015), *cert. denied* (holding an *Allen* charge

**AFFIRMED.**


**BEATTY, C.J., KITTREDGE, FEW, JJ., and Acting Justice James Edward Lockemy, concur.**

---

was not improperly coercive where the court instructed the jury on the Friday before Labor Day that they could deliberate into the night, as well as Saturday, or the following Tuesday).

3) As to the cumulative error doctrine, because the trial court did not commit any reversible errors, we reject Durant's contention that a new trial is warranted. *See State v. Johnson*, 334 S.C. 78, 93, 512 S.E.2d 795, 803 (1999) ("Respondent must demonstrate more than error in order to qualify for reversal [pursuant to the cumulative error doctrine]. Instead, the errors must adversely affect his right to a fair trial."). Moreover, Durant never argued this ground to the trial court; accordingly, it is not preserved. *See State v. Freiburger,* 366 S.C. 125, 134, 620 S.E.2d 737, 741 (2005) (holding an argument advanced on appeal that was not raised and ruled on below was not preserved for review).