# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Kenneth Simmons, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2014-000387

---

## ON WRIT OF CERTIORARI

---

Appeal from Dorchester County
Doyet A. Early, III, Post-Conviction Relief Judge

---

Opinion No. 27641
Heard March 2, 2016 – Filed June 8, 2016

---

## VACATED IN PART AND REMANDED

---

Emily C. Paavola, of Justice 360, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General Melody J. Brown, all of Columbia, for Respondent.

Joseph M. McCulloch, Jr., of Columbia, Lori R. Mason, of Cooley LLP, of Palo Alto, California, Adam S.

Gerhenson, of Cooley LLP, of Boston, Massachusetts and Jennifer Pavane Kenter, of Cooley LLP, of New York, New York, for Amicus Curiae The Innocence Network.  Daniel J. Westbook, of Nelson Mullins Riley & Scarborough, of Columbia, Vilia B. Hayes, Charles W. Cohen and Casey S. Duffy, all of Hughes Hubbard & Reed, LLP, of New York, New York, for Amici Curiae ARC of South Carolina, Able SC, SCAAIDD, Protection and Advocacy for People With Disabilities, Inc. and Family Connection of South Carolina.

---

**JUSTICE KITTREDGE:**  Petitioner Kenneth Simmons was convicted and sentenced for the 1996 murder and criminal sexual assault of an 89-year-old Summerville woman.  Petitioner sought post-conviction relief (PCR), which was granted in part.  Because Petitioner is intellectually disabled, the PCR court vacated Petitioner's death sentence and imposed a sentence of life without parole, a matter which is not before us.  *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that the Eighth Amendment prohibits the execution of mentally retarded individuals (citation omitted)).  Petitioner additionally sought a new trial on newly discovered evidence and due process grounds, which the PCR court denied without discussion.  The essence of Petitioner's new-trial claims centers on the allegation that the State misrepresented at trial the strength of the DNA[1] evidence linking Petitioner to the crimes.  The State urges this Court to not reach the merits of Petitioner's certiorari petition on issue-preservation grounds.  Alternatively, the State recommends the case be remanded to the PCR court for the issuance of a proper order setting forth findings of fact and conclusions of law.  We conclude the compelling nature of the dispute and the interests of justice warrant the "extraordinary action" of remanding the case to the PCR court for issuance of a

---

[1] DNA is the commonly used abbreviation for deoxyribonucleic acid, "the long, double-strand molecule found in the chromosomes carried in cell nuclei" that "contains the genetic blueprint for all living organisms."  *State v. Dinkins*, 319 S.C. 415, 417, 462 S.E.2d 59, 60 (1995).

proper order. *See Pruitt v. State*, 310 S.C. 254, 255 & n.2, 423 S.E.2d 127, 128 & n.2 (1992) (citations omitted). We commend the State for its alternative suggestion.

## I.

This was a brutal and horrific murder, a fact that does not escape us. From the beginning, the State relied heavily on the supposed match between Simmons's DNA and DNA found in semen at the crime scene. As the Solicitor told the jury during opening statements, the State's evidence against Simmons consisted solely of statements Simmons made to police and DNA analysis. Regarding the DNA evidence, the Solicitor told the jury the State would present the testimony of forensic analysts "that nine out of nine of the locations on DNA molecules that they compared with the semen in that vaginal swab [taken from the victim] matched the DNA from Kenneth Simmons'[s] blood."

As the South Carolina Law Enforcement Division (SLED) lacked the ability at the time to perform the necessary forensic analysis, the State sent the DNA samples to Lifecodes Corporation (Lifecodes), a private laboratory in Stamford, Connecticut. There, forensic analysis was performed by Lauren Crane and Dr. Michael Baird.[2]

_____

[2] We note that Lifecodes and its findings, including Dr. Baird's statistical analysis based on those findings, have been the subject of considerable litigation in numerous jurisdictions. *See, e.g.*, *Harvey v. State*, No. A-7963, 2004 WL 60771, at *8–11 (Alaska Ct. App. Jan. 14, 2004) (discussing experts who were critical of Dr. Baird's testimony regarding the statistical significance of DNA test results and noting that Dr. Baird and Lifecodes "were connected to controversial DNA testimony that prompted a National Research Council study of DNA evidence—a study that was critical of certain DNA testing, and that cautioned prosecutors and defense attorneys against 'over-sell[ing] DNA evidence' or arguing 'that DNA-typing is infallible'" (alteration in original)); *Caldwell v. State*, 393 S.E.2d 436, 443–44 (Ga. 1990) (crediting the uncontroverted testimony of a defense expert that "seriously call[ed] into question Lifecodes'[s] claimed power of identity . . . for the defendant's DNA identification" because Lifecodes's calculations relied upon unfounded assumptions); *People v. Keene*, 591 N.Y.S.2d 733, 741 (Sup. Ct. 1992) (ruling results from tests performed by Lifecodes to be inadmissible because "Lifecodes did not substantially perform scientifically accepted tests and techniques and did not achieve scientifically reliable results"); *People v. Castro*,

To aid their testimony, the Solicitor displayed a chart he prepared based on his review of the documentation submitted by Lifecodes, which purported to compare the victim's and Simmons's DNA with the crime-scene samples at the nine locations, or loci, that Lifecodes tested.[3]

When directly asked if Simmons's DNA matched the perpetrator's DNA at all nine loci tested, Crane responded, "What we found was a mixture of DNA which we could not eliminate Kenneth Simmons'[s] blood as being a contributor to."[4] While a correct statement, this failed to inform the jury that she was basing that opinion on only six of the loci tested. At her PCR deposition, Crane admitted the CTT test results, which looked at the other three loci, were inconclusive and had no evidentiary value for identifying Simmons. Nonetheless, Baird used the CTT test results at trial to create a "combined frequency of occurrence" for the genetic profile developed from the crime scene samples. Dr. Baird thus told the jury that based on the "nine different genetic tests done in this case," Simmons's genetic profile, which was found in the samples taken from the victim, occurred in about 1 in 1,280,249,916 white individuals and 1 in approximately 8,000,000 black individuals.

---

545 N.Y.S.2d 985, 996–99 & n.15 (Sup. Ct. 1989) (finding the results of DNA testing performed by Lifecodes to be inadmissible because Lifecodes "failed in its responsibility to perform the accepted scientific techniques and experiments in several major respects" and noting that "the population frequencies reported by Lifecodes in this case are not generally accepted by the scientific community").

[3] The first six loci (LDLR, GYPA, HBGG, D7S8, GC, and HLADOA1) were analyzed using what is known as a DQ Alpha/Polymarker (DQA/PM) test. The final three loci (CSF1PO, TPOX, and THO1) were analyzed using what is called a CTT test.

[4] Crane's trial testimony referenced the chart, even though at the time Crane said she had "not recently" seen it. During her deposition for these PCR proceedings, Crane said she had *never* seen the chart before the trial and admitted testifying off of it based on the assumption it was correct. It is now conceded that the chart contained false information.

Then, during its closing argument, the State essentially told the jury it was impossible for the DNA to have come from anyone other than Simmons: the State emphasized the supposed nine-for-nine match between Simmons's DNA and the samples recovered from the victim and noted the frequency of occurrence of Simmons's genetic profile in the black community was 1 in 8,029,316.

The jury found Simmons guilty on all charges. This Court affirmed Simmons's murder conviction and death sentence on direct appeal. *State v. Simmons*, 360 S.C. 33, 36–37, 46, 599 S.E.2d 448, 449, 454 (2004).

## II.

Simmons filed an application for PCR on multiple grounds, including an ineffective assistance of counsel claim related to his trial counsel's failure to adequately challenge the State's DNA evidence and a claim he was ineligible for the death penalty because he is "mentally retarded."[5] Simmons later amended his application for PCR, expanding on his ineffective assistance of counsel claim and adding a newly discovered evidence claim,[6] as well as a claim that the State violated his due process rights by presenting false evidence to the jury and failing to disclose exculpatory evidence.

The PCR court held multiple hearings. During the course of the PCR proceedings, it became apparent that the DNA evidence against Simmons was far weaker than the State had claimed at trial. Simmons presented numerous witnesses to testify to problems in the State's presentation of the DNA evidence and provided the PCR court with reports and affidavits from other experts. These experts were consistent

---

[5] In *Atkins*, the United State Supreme Court held that the Eighth Amendment prohibits the execution of mentally retarded individuals. In *Franklin v. Maynard*, we held that prisoners sentenced to death pre-*Atkins* could seek to have their sentences vacated in PCR proceedings. 356 S.C. 276, 280, 588 S.E.2d 604, 606 (2003). The General Assembly has since replaced the terms "mental retardation" and "mentally retarded" with "intellectual disability" and "person with intellectual disability." *See* Act No. 47, 2011 S.C. Acts 172 (codified as amended in scattered sections of titles 43–44 of the South Carolina Code).

[6] *See* S.C. Code Ann. § 17-27-20(A)(4) (2014).

in their identification of numerous problems with the way the State presented the DNA evidence at Simmons's trial. For example, the affidavit of two of those experts, Dr. Charlotte Word and Dr. Robin Cotton, identified four "critical problems": (1) "The chart used to assist with both Dr. Baird's and Ms. Crane's trial testimony contains data that are completely unsupported by the laboratory notes and results provided."[7] (2) "No credible forensic scientist would report the results from DNA testing" the way Dr. Baird did.[8] (3) Lifecodes failed to utilize "a critical and required control" for DNA tests.[9] (4) "[T]he results generated were inconsistent across the various tests."[10]

_____

[7] For one of the samples, even though no CTT test was performed, the chart indicated the test resulted in a match to Simmons's DNA. For another sample, the chart indicated the test resulted in a match to Simmons's DNA when the test actually resulted in a match to only the victim's DNA.

[8] In addition to including the CTT test results in his statistical calculations, which was inappropriate since those tests did not implicate Simmons, Dr. Baird's testimony as to the statistical frequency of Simmons's genetic profile was misleading because it ignored the fact that *other* genetic profiles were equally consistent with the crime scene samples. Baird used what are known as single-source statistics to calculate how rare *Simmons's* genetic profile is, when according to the record, he should have used what is known as random match probability to calculate the frequency of the *evidence's* profile.

[9] Lifecodes failed to use a reagent blank control, which is used to ensure DNA samples are not contaminated. Now required, reagent blank controls were strongly recommended at the time Lifecodes tested the samples in this case. According to Dr. Word, the reagent blank control has "been essentially a mandatory control in all forensic testing from day one" and "without it we don't know whether results are reliable or not."

[10] The DQA/PM tests indicated the presence of DNA from at least two individuals, while the CTT tests indicated the presence of DNA from a single individual (the victim). Moreover, gender-typing tests performed on some of the samples indicated *only* the presence of *female* DNA. Despite requesting "[a]ll notes, memoranda[,] or recordings pertaining to the preparation, execution, results[,] and outcome of any scientific/DNA experiments conducted by SLED or consulting laboratories, such as Lifecodes," Simmons never became aware of many of these

The PCR court vacated Simmons's death sentence pursuant to *Atkins* and summarily denied the remaining claims, including Simmons's challenge to the DNA evidence, "as without merit."[11]  Yet Simmons failed to file a Rule 59, SCRCP motion, as our issue-preservation rules require.

## III.

The State first argues that Simmons's claims are procedurally barred because they were not raised to the PCR court in a motion to reconsider.  We note that although the State is technically correct, we also believe dismissing the writ of certiorari would be fundamentally contrary to the interests of justice.  As discussed below, our jurisprudence permits a remand under such extraordinary circumstances.

## A.

The State, to its credit, does not deny the obvious—that is, the strength of the State's DNA evidence against Simmons was misrepresented to the jury.  We hasten to add that our careful review of the voluminous record reveals no evidence of conscious wrongdoing in the prosecution of this case.  We are persuaded that the misleading chart, and the demonstrative use of it by the State, was the result of faulty information provided by Lifecodes concerning a complex matter.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted); *see also Riddle v. Ozmint*, 369 S.C. 39, 47–48,

---

errors at trial because, as Dr. Word and Dr. Cotton concluded after reviewing the documents provided by Lifecodes, "either there are pages of documentation that were not provided or significant portions of the testing procedures were not documented in the notes."

[11] The State filed a motion to alter or amend the PCR court's *Atkins* ruling pursuant to Rule 59(e), SCRCP, which the PCR court denied.  This Court denied the State's petition for a writ of certiorari on this issue.

631 S.E.2d 70, 75 (2006) ("The failure to correct false evidence is as reprehensible as its presentation." (citing *Washington v. State*, 324 S.C. 232, 235, 478 S.E.2d 833, 834–35 (1996))).  In addition, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Alternatively, a prisoner may be entitled to relief when "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice."  S.C. Code Ann. § 17-27-20(A)(4) (2014).

**B.**

In ruling on an application for PCR, "[t]he [PCR] court shall make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented."  S.C. Code Ann. § 17-27-80 (2014).  The PCR court's general denial of all claims not specifically addressed in the PCR court's order "does not constitute a sufficient ruling on any issues since it does not set forth specific findings of fact and conclusions of law." *Marlar v. State*, 375 S.C. 407, 409, 653 S.E.2d 266, 266 (2007).  To preserve issues for appellate review, "after an order is filed, counsel has an obligation to review the order and file a Rule 59(e), SCRCP[] motion to alter or amend if the order fails to set forth the findings and the reasons for those findings as required by [section] 17-27-80 [of the South Carolina Code] and Rule 52(a), SCRCP." *Pruitt*, 310 S.C. at 256, 423 S.E.2d at 128.

As noted, we believe the State is technically correct regarding issue preservation.  However, as the State acknowledges, this Court has previously remanded cases such as this to the PCR court for findings of fact. *See, e.g.*, *McCullough v. State*, 320 S.C. 270, 272, 464 S.E.2d 340, 341 (1995) ("Although the error was not raised to and ruled on by the PCR judge, we find it necessary to vacate the order and remand this matter to the circuit court to issue an order addressing its decision to dismiss [the PCR applicant's] second application as successive.").  Our jurisprudence has referred to a remand under these circumstances as an "extraordinary action."[12] *Pruitt*, 310 S.C. at 255 n.2, 423 S.E.2d at 128 n.2.  A

---

[12] The Court in *Pruitt* said it was taking the extraordinary action of remanding the case to the PCR court "because [the Court's] opinion in *McCray*[ *v. State*, 305 S.C. 329, 408 S.E.2d 241 (1991)] is not being followed." *Pruitt*, 310 S.C. at 255 n.2, 423 S.E.2d at 128 n.2.  In *McCray*, this Court reminded PCR courts that section

remand under these circumstances must, of course, be granted sparingly and be reserved for the rarest of cases.  We believe this is such a case.

Petitioner requests that we proceed and grant relief today in the form of a new trial, an invitation we decline.  We sit today in an appellate capacity and making findings of fact de novo would be contrary to this appellate setting.  *See, e.g.*, *In re Treatment & Care of Luckabaugh*, 351 S.C. 122, 131–34, 568 S.E.2d 338, 342–44 (2002) (vacating and remanding a trial court's ruling because that court's order did not contain factual findings "sufficient to allow this Court, sitting in its appellate capacity, to ensure the law is faithfully executed below," and refusing to engage in the speculation that would be required to uphold the trial court's decision (citations omitted)).  Moreover, a preemptive ruling on the merits would be unfair to the State, which would be deprived of the opportunity to have this matter fully resolved by a proper order from the PCR court.  In this regard, the State correctly asserts it should not be foreclosed from the panoply of arguments available to it, especially related to the prejudice prong in the PCR analysis and the strength of Petitioner's confession to the crimes.  In striking this difficult balance, we believe a remand is in the best interests of justice.  And finally, because of the growing knowledge of science as it relates to DNA, we grant the PCR court discretion to permit additional evidence.[13]

## IV.

We therefore remand this matter to the PCR court for proceedings consistent with this opinion.

---

17-27-80 "requires the PCR court to 'make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented.'"  *McCray*, 305 S.C. at 330, 408 S.E.2d at 241 (quoting S.C. Code Ann. § 17-27-80).

[13] We grant this discretion to permit additional evidence with some reservation, for we, like all involved, are aware of the years of litigation in this case.  Thus, this matter should be expedited, regardless of whether the PCR court allows additional evidence.

**VACATED IN PART AND REMANDED.**

**PLEICONES, C.J., BEATTY, HEARN and FEW, JJ., concur.**