# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Jerome Curtis Buckson, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2016-001430

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Spartanburg County
J. Derham Cole, Trial Court Judge
J. Mark Hayes II, Post-Conviction Relief Judge

---

Opinion No. 27805
Heard December 13, 2017 – Filed May 23, 2018

---

## REVERSED

---

Tricia A. Blanchette, of the Law Office of Tricia A. Blanchette, LLC, of Leesville, for Petitioner.

Attorney General Alan McCrory Wilson and Assistant Attorney General Valerie Garcia Giovanoli, both of Columbia, for Respondent.

---

**JUSTICE FEW:** The post-conviction relief (PCR) court granted Jerome Curtis Buckson relief and ordered a new trial. The State appealed, arguing no probative evidence supports the findings of the PCR court. The court of appeals reversed the PCR court. We reverse the court of appeals.

## I. Facts and Procedural History

Buckson and Tiffany Foggie lived together in Foggie's apartment in Spartanburg until at least early to mid-January 2006. At approximately three o'clock in the morning on Monday, January 30, 2006, Buckson entered the apartment through a kitchen window, and proceeded up the stairs to Foggie's bedroom. The door to the bedroom was closed and locked. Foggie and Buckson had been yelling to one another from the time he was outside, and Foggie told Buckson to leave. Instead, he forced the door open to find another man in the room. After a brief struggle, Foggie was shot. Buckson fled the apartment and called 911. He told the 911 operator the man shot at him, and that he heard other shots as he fled. He later learned Foggie was dead from a gunshot wound.

The State charged Buckson with murder and first degree burglary. At trial, Buckson testified the man approached him with a gun, and when Foggie tried to "swat" the gun down, it discharged. The jury found Buckson not guilty of murder. As to the burglary, the State presented evidence that Buckson no longer lived in the apartment on the night Foggie died, and Buckson's trial counsel presented evidence that he did. The jury found Buckson guilty of first degree burglary. The trial court sentenced him to twenty years in prison. The court of appeals affirmed. *State v. Buckson*, Op. No. 2010-UP-282 (S.C. Ct. App. filed May 20, 2010).

Buckson filed a PCR application alleging ineffective assistance of counsel. Buckson's primary claim was trial counsel was ineffective in his presentation of evidence that Buckson still lived in the apartment on the night Foggie died. *See State v. Singley*, 392 S.C. 270, 276, 709 S.E.2d 603, 606 (2011) (stating "'one cannot commit the offence of burglary by breaking into his own home'" (quoting *State v. Trapp*, 17 S.C. 467, 470 (1882))).[1] The PCR court found "trial counsel was [deficient] when he failed to prepare and investigate, failed to call witnesses, and failed to utilize trial witnesses to establish that the apartment . . . was . . . his . . . residence," and Buckson "was prejudiced as a result of counsel's [deficient performance]." The PCR court granted Buckson a new trial.

The State appealed by filing a petition for a writ of certiorari in which it raised four separate issues. Three of the issues relate to Buckson's primary claim. As to these

---

[1] In *Trapp*, we used the word "house." 17 S.C. at 470. In *Singley*, we used "home." 392 S.C. at 276, 709 S.E.2d at 606.

three issues—which we address collectively—the State argued only that the PCR court's findings of deficiency and prejudice were not supported by any probative evidence. The State raised no questions of law, and did not make any argument that the PCR court failed to defer to the strategic considerations of trial counsel. The State's other issue related to a different claim we need not address.[2]

We transferred the State's certiorari petition to the court of appeals pursuant to Rule 243(l) of the South Carolina Appellate Court Rules. The court of appeals granted the petition, and reversed in an unpublished opinion. *Buckson v. State*, Op. No. 2016-UP-174 (S.C. Ct. App. filed Apr. 13, 2016). We granted Buckson's petition for a writ of certiorari, and now reverse the court of appeals.

## II.    Analysis

We begin our analysis by summarizing the evidence trial counsel presented on the question of whether Buckson still lived with Foggie on January 30th. First, counsel called Buckson's mother, who testified she was very close to Foggie and talked to her "almost every day," including Sunday night, the 29th. When asked "where was Buckson staying," she replied "with Tiffany Foggie. . . . That's where he lived." Buckson's mother also testified the reason Buckson was not at the apartment earlier Sunday evening is that he was at the mother's house babysitting her youngest son. Chad Tate—who fathered two children with Foggie—testified he called his children daily, and Buckson was still answering the phone "most every day" in January 2006. Tate also testified that when he would pick his children up at Foggie's apartment, "I would usually see Jerome Buckson." Counsel called Buckson's aunt, who testified she "didn't miss a week" stopping by Foggie's apartment, and "[Buckson] lived there. He definitely lived there." However, none of these witnesses specifically testified Buckson still lived with Foggie on January 30th.

Finally, Buckson explained "I was her boyfriend," and that she asked him to move in with her "a year before the crime happened." He testified he spent Friday night

---

[2] The State's other issue relates to Buckson's claim that trial counsel was ineffective for not objecting to the jury's completed verdict form. Because we reinstate the PCR court's ruling that Buckson is entitled a new trial based on his primary claim, we do not address the verdict form issue. *See Workman v. State*, 412 S.C. 128, 133, 771 S.E.2d 636, 639 (2015) (recognizing that because the applicant will receive PCR on one claim, "we need not address" the remaining issues) (citing *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).

the 28th at the apartment, but he spent Saturday night at his Mom's house because "she was having health issues and I wanted to look after them, but I went back to the apartment basically Sunday morning." Buckson testified Foggie sent him text messages on Sunday, and "she called me and asked me what time I was coming home." He testified the last time he talked to Foggie on the phone was 11:30 Sunday night. Counsel introduced photographs of the interior of Foggie's apartment taken by law enforcement. Buckson identified a number of his personal items shown in the photographs, including his toothbrush and some clothing. Buckson explained the reason he did not have a key on January 30th, and that it was common for him to use the window to enter the apartment. Buckson specifically testified he still lived with Foggie "the weekend of January 30th."

At his PCR trial, Buckson presented the testimony of five witnesses he claims trial counsel should have called at the criminal trial. Much of this testimony is similar to testimony elicited by trial counsel. However, some of the testimony was new and was not presented to the jury. For example, Elliot Cannady was in Foggie's apartment during the day on Sunday with his co-worker Mark Watson, the man Buckson later found in Foggie's bedroom with a gun. Cannady testified it appeared that "a man had been living in the apartment," and Foggie appeared "jittery, afraid" and made comments about being worried that her "boyfriend" was coming home. Referring to Foggie and Watson, Cannady testified "it appeared from their actions and conduct that they were concerned about that man, whether it be a friend or boyfriend, returning to the apartment that night."

Antwan Martin testified he spent the entire day on Sunday the 29th with Buckson. Martin explained it was his understanding "that on January 29th, . . . Mr. Buckson . . . lived at that apartment with Ms. Foggie," and "everything appear[ed] to [me] as if they were still dating and living together on January 29th." Martin also testified Buckson had numerous missed calls from Foggie that day.

Lloyd Williams was Foggie's stepfather. He testified at the PCR trial that he visited Foggie and her children at the apartment "at least once a week," and Buckson was there "most of the time." He explained his understanding "that they were still dating on the night of January 29, 2006," and he talked to Foggie "often enough that [he] would know if they were not dating." Williams went to the apartment on Sunday the 29th, and Foggie would not come to the door. When Foggie finally let Williams in, she explained to him "she didn't want to come to the door because she thought it was [Buckson]." Williams testified Watson was there, and Williams said "Oh, y'all over here creeping." PCR counsel asked, "And would that be 'creeping' because you knew that Mr. Buckson wasn't home at the time and it was something that she was

doing behind his back?" Williams equivocated, responding, "Well, not directly in that order." PCR counsel pushed the question again later, asking, "And was it your understanding that Mr. Buckson was just merely going home that night?" After Williams equivocated again, PCR counsel had Williams silently read a portion of a written statement he gave PCR counsel's investigator, and the following took place,

> Counsel: Reading that statement, does that help refresh your memory as to whether or not you knew he was living there?
>
> Did you, in fact, believe he was living there?
>
> Williams: Yeah, I kind of -- I believed that, but that was in the early stages, and when I would go over there and she would tell me he's upstairs asleep or something like that. So, I make the assumption that he was living there.

Williams also testified "it was common knowledge that [Foggie] would keep the kitchen window . . . unlocked so that they could . . . get in to unlock the back door."[3] Cannady, Martin, and Williams each testified they were never contacted by trial counsel or his investigator prior to Buckson's trial, but were willing to testify if they had been called.

Based on this testimony, the PCR court found trial counsel's failure to call the PCR witnesses at the criminal trial was unreasonable. The PCR court specifically found Cannady, Martin, and Williams "to be credible," and that Buckson's defense to the burglary charge "would have been aided by [their] testimony." The PCR court recited several specific reasons he found this testimony would have made a difference in the outcome of the trial. First, he found the testimony would have contradicted the State's witnesses and corroborated Buckson's trial testimony. The fact that none of the trial witnesses were in Foggie's apartment on Sunday, but Cannady and Williams were, and Martin was with Buckson all day Sunday, supports the PCR court's finding. In addition, the PCR court stated,

---

[3] It appears as though this testimony may be Williams reading from his previous written statement. We cannot tell, however, as the State did not include the statement in the Appendix at the court of appeals.

Even though the [trial] witnesses provided some pertinent testimony, trial counsel called only one non-family member when these other vital non-family member witnesses were available. Interestingly, Lloyd Williams and Elliott Cannady were listed as potential State witnesses and were willing to testify for the defense despite being Ms. Foggie's stepfather and Mr. Watson's friend.

The PCR court found "these factors combined with the credibility of the witnesses' testimony would have been highly persuasive to the jury and would have likely affected the outcome of the trial." *See Williams v. State*, 363 S.C. 341, 343, 611 S.E.2d 232, 233 (2005) ("A PCR applicant claiming trial counsel rendered ineffective assistance must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different." (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))).

An appellate court must give deference to the PCR court's factual findings, and must uphold them if there is any evidence of probative value to support them. *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016). In this case, the court of appeals failed to observe this standard for appellate review. In its opinion, the court of appeals stated it conducted "a thorough review of the record" from which it concluded, "In our view, trial counsel acted reasonably." On the prejudice question, the court of appeals stated, "We find [Buckson] failed to demonstrate he was prejudiced."

Under the proper standard of review, the appellate court's "view" must be limited to whether there is probative evidence to support the PCR court's factual findings. Ordinarily, the appellate court is not free to make its own factual findings. *Compare Simmons v. State*, 416 S.C. 584, 593, 788 S.E.2d 220, 225 (2016) (remanding to the PCR court for findings, and stating, "We sit today in an appellate capacity and making findings of fact de novo would be contrary to this appellate setting") *with Smalls v. State*, 422 S.C. 174, ___, 810 S.E.2d 836, 847 (2018) (finding under unique circumstances the appellate court may make the findings itself). The State appealed the PCR court's award of relief on purely factual arguments, and this decision by the State restricted the court of appeals to the deferential review we give factual findings in PCR cases. Because there is ample evidence to support the PCR court's findings, the court of appeals erred by not giving those findings deference.

In most PCR cases in which the applicant seeks relief for trial counsel's failure to call witnesses, the PCR court's analysis—and the analysis by the appellate court—is focused on the strategic considerations of counsel in balancing the potential benefits of calling a particular witness against the identifiable risks. *See, e.g.*, *Edwards v. State*, 392 S.C. 449, 457, 710 S.E.2d 60, 64-65 (2011) (deferring to trial counsel's strategic considerations); *Jackson v. State*, 329 S.C. 345, 350, 495 S.E.2d 768, 770-71 (1998) (same); *Stokes v. State*, 308 S.C. 546, 548, 419 S.E.2d 778, 779 (1992) (same). A PCR court's analysis of counsel's strategic decisions must be "highly deferential" to counsel's judgment, and "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*.

In his testimony at the PCR trial, Buckson's highly-experienced trial counsel explained the strategic basis for the decisions he made. He testified,

> Every witness, while he brings something good, . . . brings cross-examination with him and sometimes that can be a disaster. You can lose more ground than you can gain. I try to call witnesses that I can get something out of and that the State won't have a stronger case when I sit down.

Counsel then articulated specific reasons he did not call Cannady, Martin, and Williams. The State used the words "strategy" and "strategic decisions" in isolated places in its brief to the court of appeals, and even refers to trial counsel's testimony we quote above. Nevertheless, our law provides that issues must be raised in the Statement of Issues on Appeal. Rule 208(b)(1)(B), SCACR. While we seek to be flexible interpreting issue statements, "Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal." *Id*. In this case, the issue statements in the State's brief to the court of appeals say nothing whatsoever about the strategic considerations of counsel. In addition, the State's arguments in the body of the brief relate to the sufficiency of the evidence, not strategy, and the State does not cite any legal authority on the issue of strategy.

### III.   Conclusion

We **REVERSE** the court of appeals, reinstate the PCR court's judgment granting Buckson relief, and remand to the court of general sessions for a new trial.

**HEARN, J., concurs. JAMES, J., concurring in a separate opinion in which BEATTY, C.J., concurs.  KITTREDGE, J., dissenting in a separate opinion.**

**JUSTICE JAMES:** I concur in the majority opinion, but I write separately to emphasize that our—and the court of appeals'—resolution of this appeal must be guided by application of the correct standard of review. As the majority recites, and as the dissent agrees, an appellate court must give deference to the PCR court's factual findings and must uphold these findings if there is any evidence of probative value to support them. While the court of appeals *articulated* the correct standard of review, its analysis is proof it did not *apply* the correct standard of review in reversing the PCR court.

The majority correctly concludes the court of appeals failed to apply the correct standard of review. The dissent agrees with that statement but argues the State should not be penalized because "the State did not ask the court of appeals to utilize an incorrect standard of review." Therefore, the dissent concludes, we should remand to the court of appeals to allow for reconsideration by the court of appeals pursuant to the correct standard of review. I respectfully disagree with a remand, as the only decision the court of appeals could correctly reach on remand would be the one reached by the majority. That is the nature of the standard of review by which we and the court of appeals are bound. Another PCR court may have analyzed the same facts and the same issues and denied relief to Buckson; in such an instance, we would likely be constrained to affirm that conclusion as well. However, based upon the evidence presented at the PCR hearing, *this* particular PCR court concluded trial counsel was deficient and that this deficiency prejudiced Buckson. Those conclusions were driven by the PCR court's analysis of facts in the record. Our role as a reviewing court is to determine whether evidence of probative value supports the PCR court's factual conclusions. As the majority explains, probative evidence in the record supports the PCR court's factual conclusions. That is the end of the appellate inquiry, regardless of whether the inquiry is conducted by the court of appeals or by this Court.

I also agree with the majority's discussion of the issue of a valid trial strategy. At oral argument, the State argued that we should affirm the court of appeals because trial counsel's actions were guided by a valid trial strategy. Until oral argument before us, the State never advanced the argument that trial counsel's decisions were guided by valid strategic considerations.[4] Therefore, the majority properly declined to address that issue.

**BEATTY, C.J., concurs.**

---

[4] Counsel for the State at oral argument before us did not author the State's briefs to the court of appeals or to this Court.

**JUSTICE KITTREDGE:** While I agree with the majority that the court of appeals applied the incorrect standard of review, I dissent from the Court's decision to reverse the court of appeals and reinstate the judgment of the PCR court. Rather than an outright reversal of the court of appeals, I would vacate the opinion and remand to the court of appeals for reconsideration of the State's appeal in accordance with the proper standard of review.

On certiorari from the court of appeals to the PCR court, the State argued that, as to several particulars, there "was no probative evidence to support the PCR court's finding[s]." The State's brief is significant in two respects. First, the assertion of "no probative evidence" is tantamount to arguing that the PCR court erred as a matter of law. The characterization by the majority that the State appealed "on purely factual arguments" is unfair, in my judgment. Second, the State did not ask the court of appeals to utilize an incorrect standard of review. I believe the State is entitled to a proper consideration by the court of appeals of its appeal under the proper standard of review.

If the issue were merely whether there is any evidence to support the finding of deficient representation, I would likely join the majority and not waste time and judicial resources by a remand to the court of appeals. It is my judgment that a substantial question is presented as to whether there is any evidence to support the finding of prejudice under the proper standard of review. By reversing the court of appeals for utilizing the wrong standard of review, the Court gives Petitioner a pass on the prejudice prong. Moreover, and in respectful response to the concurring opinion, I see long-term value in remanding the case and requiring the court of appeals to apply the proper standard of review.